(No. 73903.—

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. GLENN H. WILSON, Appellant.

*Opinion filed December 22, 1994.—Rehearing denied April 3, 1995.*

438

HARRISON, J., dissenting.

Charles M. Schiedel, Deputy Defender, of Springfield, and Steven Clark, Assistant Defender, of Chicago, both of the Office of the State Appellate Defender, for appellant.

Roland W. Burris, Attorney General, of Springfield, and Charles Reynard, State's Attorney, of Bloomington (Rosalyn B. Kaplan, Solicitor General, and Terence M. Madsen and Martha E. Gillis, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE HEIPLE delivered the opinion of the court:

Following a jury trial, defendant, Glenn H. Wilson, was convicted of three counts of first degree murder and one count of armed robbery. At the first stage of the death penalty hearing, the same jury found defendant eligible for the death penalty on the basis of multiple

murder and murder in the course of a felony. Defendant waived his right to a jury at the second stage of the death penalty hearing. After presentation of evidence by both sides, the trial judge found that there were no sufficient mitigating factors to preclude imposition of the death sentence. Defendant was sentenced to death and a term of 30 years for the armed robbery. Defendant's death sentence was stayed (134 Ill. 2d R. 609(a)), pending direct appeal to this court (Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d R. 603). We affirm defendant's convictions and sentences.

On appeal to this court, defendant argues that: (1) the statements he made to police should have been suppressed at trial, since *Miranda* warnings were not given and the police interrogation was coercive; (2) defense counsel was ineffective for failing to claim that the statements defendant made were involuntary and the result of coercion; (3) defense counsel was ineffective for failing to seek suppression of statements that defendant gave to a county mental health therapist; (4) the statements he made to a county mental health therapist were erroneously admitted at trial; (5) the State's Attorney incorrectly issued subpoenas without the direction of the grand jury or the supervision of the court; (6) he was denied a fair trial by the use of evidence of his prior armed robbery conviction in spite of a motion *in limine*; (7) he was not proven eligible for the death penalty beyond a reasonable doubt; (8) the sentence of death was excessive; (9) the use of aggravation evidence of his gang membership violated his constitutional rights; (10) the Illinois death penalty statute is unconstitutional; and (11) the sentencing hearing was unconstitutional since the State was allowed to open and close the sentencing hearing.

## FACTS

On October 27, 1988, three persons were shot and

killed during an armed robbery at S&S Liquor Store in Bloomington, Illinois. Defendant was arrested on an unrelated weapons charge on June 1, 1989. Between the time of defendant's arrest on June 1, 1989, and June 9, 1989, defendant made several statements to the police regarding the S&S murders. On March 28, 1991, defendant was charged with six counts of murder and one count of armed robbery. Before trial, defense counsel filed several motions to suppress the statements.

At the hearing on defendant's motions to suppress, the following was elicited. On June 1, 1989, shortly after being taken into custody and placed in a jail cell on the unrelated weapons charge, defendant attempted suicide. Defendant was transported to St. Joseph's Medical Center. While at the Center, Officer Jeff Sanders noticed that defendant appeared to be under a great deal of stress. Sanders began speaking with defendant in an attempt to calm him. Defendant began mumbling to Sanders and said that "he never meant to hurt anybody or for anyone to get hurt." Sanders then suggested that defendant might consider working with the police. Defendant initially responded that he could not do that, because someone might kill him if he spoke to the police. Defendant then began talking to Sanders about robberies and homicides which had occurred in the area. Sanders asked if defendant knew anything about the S&S murders. Defendant replied that "everyone knew who did it" and that "they were very bad people." Defendant eventually agreed to work with the police. After defendant was examined at the Center, he was returned to the police department. Sanders then advised Detective Dan Katz that defendant possibly had information on the S&S murders.

Shortly after defendant was returned to the police department, Detective Katz began talking to defendant. Defendant provided Katz with information about gangs

in the Bloomington area. After receiving this information, Katz contacted Agent Bernardini of the Illinois State Police, who was more of an authority on gangs than Katz was. Bernardini arrived at the police station about 8 p.m. and joined the conversation between Katz and defendant. Defendant expressed a wish to gain release from jail that evening if he provided gang information. Katz informed defendant that Katz did not have the authority to release him from jail, and the conversation continued. Bernardini then told defendant that he was still puzzled about why three persons had been shot during the S&S robbery. Defendant responded that "that was a spur of the moment thing" and "not supposed to happen." Defendant then resumed talking about gang activities. Defendant again asked to be released. After speaking to his sergeant, Katz told defendant that he could not be released that evening. Defendant told Katz and Bernardini that if he was released from custody, he would tell them in a day or two who had committed the S&S robbery and murders. When Katz told defendant that he could not be released, defendant said that he actually knew who committed the S&S murders.

Without any prompting from the police, defendant then stated that three individuals, Charles Smith, Gary Jones and Al Harris, had committed the armed robbery and murders and that he had witnessed it. Defendant recounted that he saw these three men sitting in Smith's car at People's Drug in Bloomington on the night of October 27. After defendant approached the car, he noticed numerous guns in the vehicle. Defendant observed two of the men looking at a map of Bloomington to determine the location of S&S, and defendant heard the men discussing an armed robbery. When the men left the parking lot, defendant followed them around Bloomington. When the men did not drive to

S&S, defendant returned to his home. Once every hour, defendant left his home, drove around the city of Bloomington to find the men, and followed them. Each time the men failed to near S&S, defendant would return home. After several trips and around 10 p.m., defendant followed the men to S&S and watched them from a nearby gas station. Defendant saw the men enter S&S while carrying guns. Defendant said he heard a shot. After the men exited S&S, defendant drove back to his home.

After Katz and Bernardini expressed doubts about defendant's story, defendant said that if he told the truth, he would just be getting himself "in deeper." Defendant then stated that he knew the robbery was to occur at 10 o'clock and that he was to meet the men at S&S. Defendant said that he did arrive at S&S around 10 p.m. and was hoping to get money out of the men after the armed robbery occurred. During the course of these conversations, defendant was given the opportunity to use the rest room and to obtain something to drink.

Upon Katz and Bernardini's request, defendant agreed to voluntarily accompany the officers to the crime scene. Defendant directed everyone to a gas station across the street from S&S and said that he witnessed the crime from that location. As defendant explained what he saw on the night of October 27, Katz told defendant that it seemed improbable that defendant could have seen the crime from such a distance. Defendant then said he would show the police where he was really standing, and defendant moved to a sidewalk near a street that separated the gas station from S&S. Katz once again told defendant that it was improbable that he could see the crime from that distance. Defendant then moved next to the brick wall of S&S and said that he saw the robbery in progress from that location.

Katz then said that it was impossible to see through the brick wall into S&S. Defendant then moved to a position outside the front doors of S&S. Defendant said that when he looked in the store, he saw Robert Webb, a store employee, inside. He also noticed an individual lying on a rubber mat behind the cash register. Defendant was advised that it was impossible to see this from his claimed location. Defendant was also told that he needed to tell the truth about that night and that the police had a footwear impression from inside the store. Defendant said that he may have placed one foot into the store. Defendant stated that he was going to receive $500 for being a lookout for the three men. Defendant was then taken back to the police department.

Defendant was given breakfast, and a typewritten statement was taken from defendant between 6 a.m. and 8:10 a.m. Katz did not give defendant *Miranda* warnings prior to taking the statement, because defendant was still considered a witness. When the McLean County State's Attorney learned that *Miranda* warnings had not been given, Katz was advised to go back, read *Miranda* warnings to defendant, and take a second statement. At approximately 10:10 a.m. on June 2, defendant was given *Miranda* warnings; defendant waived his rights and stated that he was willing to give another voluntary statement. The second statement was similar to the first. Both statements set forth defendant's involvement as a lookout for the three men. Prior to 10:10 a.m. on June 2, defendant had never been given *Miranda* warnings.

On June 4, Richard Humber, a consultant with the Bloomington police department, met with defendant. Humber read defendant his rights, and then defendant began talking about the evening of October 27. Defendant stated that he met the three men in the parking lot of People's Drug and that Harris told defendant that.

he would pay defendant $500 if defendant acted as a lookout during the robbery. He stated that he stood with Jones by the front door of S&S while the other two men went inside. After defendant saw Harris fire a gun, both Harris and Smith ran out of the store and drove away with Jones. Defendant then returned to his home without receiving any money for acting as the lookout.

On June 5, Katz once again met with defendant in an attempt to obtain more information about the S&S murders. Katz did not read defendant *Miranda* warnings, because he still viewed defendant as a witness and not a suspect. Defendant spoke of the night of the crime and gave descriptions of the three men.

Katz also spoke with defendant on the evening of June 9. Defendant was not read *Miranda* warnings, but defendant was told that he did not have to talk to anyone and that anything he said could be used against him unless the police were going to offer him something in return for his testimony. The public defender was present at this meeting. Defendant stated that his prior statements were untrue and that the three men had come to his residence to buy guns before the murders.

The trial court suppressed the first written statement that defendant gave the police on June 2, since defendant had not been given *Miranda* warnings. Defendant's June 5 statement was also suppressed. Motions to suppress were denied as to defendant's oral statements at the hospital and the police station on June 1, the oral statements at the crime scene on June 2, the second written statement on June 2, and the oral statements on June 4 and June 9.

At defendant's trial, Tracy Gault, an employee of S&S on October 27, testified that two black men came into the store about 10 o'clock that evening. After a few minutes, Gault saw the two men come down the center aisle of the store moving toward her, with two custom-

ers, Scott Burton and Whitney Cole, in front of them. Robert Webb, another employee of S&S, approached the two men. Gault saw Webb say something to the men and then noticed that the taller of the two men had a gun. The men then ordered the two customers and Webb down onto the floor. Gault was ordered to open the cash register, and the taller man fired a shot. After Gault opened the cash register, the shorter man reached into the drawer and took out money. Gault then got down onto the floor, but was ordered up to open the safe. Gault proceeded to take the money out of the safe and hand it to the shorter man. Gault asked the shorter man if he wanted the change from the safe. He answered no and then pistol-whipped Gault in the face. Gault immediately crouched against the wall near the safe and thereafter heard three gunshots. The store became quiet, and after about 30 seconds, Gault crawled out from near the safe. Gault noticed that the woman customer had blood coming from her mouth. Gault dialed 911. After the police arrived, Gault described both men to the police. A police artist developed sketches of the men. The police artist testified that the sketch of the taller man appeared to depict the defendant. Gault later identified Alvin Alexander, defendant's brother, as the shorter man.

When the police arrived at the scene, they found Burton already dead and the other two still breathing. Both Webb and Cole died later. The cause of death for all three individuals was a gunshot wound to the head.

The jury also heard Julie Rice of the McLean County Human Services testify that on the afternoon of June 5, 1989, she spoke with defendant to assess whether he remained suicidal. Rice could not recall whether defendant requested that she visit him or if the jail staff requested that she visit defendant. Rice testified that defendant told her that four persons could tell that he

committed the S&S armed robbery/murders and that he gave the police aliases for these four persons. Defendant told Rice that if he said who actually committed the crimes, he himself would be buried. Rice suggested that defendant write a journal about his thoughts as a way to relieve stress. Over time, defendant shared parts of that journal with Rice, by sticking it through the bars of his jail cell as Rice walked through the jail. The first page of the journal, dated July 4, 1989, was admitted as evidence.

Other evidence adduced at trial included Katz's testifying that the location of the bodies inside the store was not released to the press, but defendant knew of the location of one of the bodies when he spoke to police at the crime scene. Two of defendant's cell mates testified that defendant told them that he robbed a liquor store and shot someone. John Daniels testified that in August of 1990, defendant told him that he and some other men went into a liquor store in Bloomington to commit a robbery and that people were shot and another lady was pistol-whipped. Robert Faraci testified that in January 1991, defendant told him that he robbed a liquor store and shot someone in Bloomington. Defendant's son, Jarmaine Wilson, also testified that on the night of the murder, defendant used a gun to threaten his mother to drive a car. Jarmaine's mother acquiesced and got into the car; defendant sat on the front passenger side and Jarmaine rode hunched down in the back. Alvin Alexander rode in a separate car which accompanied the car in which Jarmaine was riding. When the car stopped, defendant got out while Jarmaine remained hunched down in the backseat. Several minutes later defendant got back into the car and ordered Jarmaine's mother to hurry.

The State also offered the testimony of three other witnesses who had gone to S&S on the night of the

murders to buy liquor. Two of these witnesses testified that they saw two black men walking toward S&S on October 27. Each witness stated that the police drawings based on Gault's descriptions were good likenesses of the men they saw. The third witness made an in-court identification of defendant as the taller man she saw approaching S&S on the night of October 27. The unsuppressed statements defendant made to the police were also admitted as evidence.

Defendant did not testify on his own behalf at trial. The defense presented one witness who attempted to discredit Jarmaine Wilson's testimony. The jury returned guilty verdicts for three counts of murder and one count of armed robbery. The same jury found defendant eligible for the death penalty on the basis of multiple murder and murder in the course of a felony. Defendant then waived his right to have a jury for the second phase of the death penalty hearing. After hearing evidence in aggravation and mitigation, the trial judge found that almost no mitigation evidence existed. Defendant was sentenced to death for the murders and sentenced to 30 years' imprisonment for the armed robbery.

## ADMISSIBILITY OF DEFENDANT'S STATEMENTS

Defendant first alleges that the trial court committed reversible error when it failed to suppress the incriminating statements he made to the police. Defendant claims that his June 1 statements to Sanders at the hospital, his June 1 statements upon his return to the police station, his June 2 statements at the crime scene, his second written statement, and his June 4 statement to Humber should have been suppressed as violations of his fifth amendment rights. Defendant specifically contends that these statements were involuntary and the result of a coercive interrogation.

A trial court's decision to deny a motion to suppress

will not be overturned unless the decision is manifestly erroneous. (*People v. Brown* (1990), 136 Ill. 2d 116, 125.) It appears from the suppression rulings that the trial court determined that *Miranda* warnings were necessary beginning at the time defendant was returned to the police station from the crime scene on the morning of June 2. This decision is not manifestly erroneous.

When an individual is taken into custody and interrogated, certain procedural safeguards are necessary to protect that individual's constitutional right against self-incrimination. (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602.) Not all statements given by a defendant after he "has been taken into custody are to be considered the product of interrogation." (*Rhode Island v. Innis* (1980), 446 U.S. 291, 299, 64 L. Ed. 2d 297, 307, 100 S. Ct. 1682, 1689.) Any statement which is volunteered is not necessarily barred by the fifth amendment and can be admitted at trial. *Miranda*, 384 U.S. at 478, 16 L. Ed. 2d at 726, 86 S. Ct. at 1630.

The *Miranda* Court noted that "[t]he fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated." (*Miranda*, 384 U.S. at 478, 16 L. Ed. 2d at 726, 86 S. Ct. at 1630.) Interrogation occurs through express police questioning or "any words or actions on the part of the police *** that the police should know are reasonably likely to elicit an incriminating response from the *suspect*." (Emphasis added.) *Innis*, 446 U.S. at 301, 64 L. Ed. 2d at 308, 100 S. Ct. at 1689-90.

Although defendant was not given *Miranda* warnings until 10:10 a.m. on June 2, the statements he made about S&S prior to this time were voluntary and properly admitted at trial. At the hospital, Officer Sanders asked defendant if he knew anything about the S&S

crimes. Defendant responded that "everyone knew who did it." Although defendant made these statements, he was not a suspect in the S&S crimes at this time.

Upon defendant's return to the police station, defendant was the one who initiated the conversation about S&S. Defendant voluntarily told Katz and Bernardini about his knowledge of the S&S murders in hope of being released from jail. Defendant was not made any promises in return for his statements. At this time, defendant was not regarded as a suspect in the murders. Although the detectives expressed doubts about defendant's story, their doubts were not designed to elicit an incriminating response from defendant. As far as the detectives knew, defendant had no incriminating responses to make. In actuality, in the seven months between the murders and defendant's arrest, the police had not come across defendant's name as that of a potential suspect.

Defendant then voluntarily accompanied the detectives to the crime scene. The record does not indicate that defendant was forced to go with the police officers; nor does it reflect that the officers used threats, weapons, or any other show of force to coerce defendant to accompany them. (See *United States v. Mendenhall* (1980), 446 U.S. 544, 557-58, 64 L. Ed. 2d 497, 511-12, 100 S. Ct. 1870, 1879.) None of the officers' statements at the crime scene were designed to elicit an incriminating response from defendant, as defendant was still considered a witness to and not a suspect in the murders. Only after defendant stated that he was supposed to receive $500 for being a lookout was he entitled to *Miranda* warnings. Only at this point in time should the officers have known that any further questioning or words would be likely to elicit an incriminating response from a suspect. Thus, the trial court's allowing into evidence defendant's June 1 statements at the hospital and police station and

defendant's June 2 statements at the crime scene was not manifestly erroneous, since defendant was not a suspect at these times.

Defendant also contends that his second written statement on June 2 and his statement to Humber on June 4 were tainted by the failure of the police to provide *Miranda* warnings prior to the first written statement. We disagree. Defendant was not forced or coerced into making the first written statement to the police. He had been back at the police station for several hours before the statement was taken, had been given the opportunity to rest, and had been given food to eat. The reading of *Miranda* warnings to defendant at approximately 10:10 a.m. on June 2 cured the condition that made the prior voluntary, but unwarned, written statement inadmissible. (See *Oregon v. Elstad* (1985), 470 U.S. 298, 311-12, 84 L. Ed. 2d 222, 233-34, 105 S. Ct. 1285, 1294-95.) Once defendant was warned of his rights, he was free to exercise his own decision of whether to make the second written statement. (See *Elstad*, 470 U.S. at 308, 84 L. Ed. 2d at 232, 105 S. Ct. at 1293.) Two hours had passed from the end of defendant's first written statement until the time he was read his *Miranda* warnings. The record does not reflect that defendant was subject to police interrogation, force, threats or harassment during this two-hour period; defendant was not continually questioned about the S&S crimes. Defendant voluntarily waived his rights before making the second written statement. Although the *Miranda* warnings did not allow for the first written statement to be admitted into evidence, they did adequately warn defendant of his rights. Once defendant voluntarily waived these rights, the second written statement became admissible. Likewise, the statement which defendant made to Humber two days later, which was also directly preceded by *Miranda* warnings, was admissible.

We decline to rule on the statements defendant made to Detective Katz on June 9. These statements were not admitted against defendant at trial and cannot be used as a basis to reverse his conviction. Thus, the trial court's decision to deny defendant's motion to suppress the statements he made to the police was not manifestly erroneous.

Defendant also contends that he was denied effective assistance of counsel to the extent trial counsel failed to argue that defendant's statements to the police were involuntary because of coercive circumstances. To prevail on a claim of ineffective assistance of counsel, defendant must prove that defense counsel's actions were so deficient that they were unreasonable *and* that the actions prejudiced the result of the trial. (*Strickland v. Washington* (1984), 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064.) Defense counsel's actions here were not so deficient as to have resulted in ineffective assistance of counsel. The motions to suppress defendant's statements asserted, among other claims, that "the statements were not made by the defendant voluntarily." Defense counsel sufficiently raised this claim in the trial court.

## DEFENDANT'S MENTAL HEALTH RECORDS AND JOURNAL

Defendant claims that he was also denied effective assistance of counsel when defense counsel failed to seek suppression of the statements he made to Julie Rice. Defendant claims that Rice is an agent of the State and that Rice knew when she was speaking with defendant that some of her questions could have elicited incriminating responses. Since he was in custody at the time of Rice's visit, defendant claims he should have been given *Miranda* warnings. Defendant argues that defense counsel erred when he failed to recognize that the statements were obtained in violation of defendant's constitutional rights and when he failed to move to suppress the statements on this ground. Defendant also claims that

he was prejudiced by defense counsel's failure to have the statements suppressed.

As mentioned, to prevail on a claim of ineffective assistance of counsel, defendant must prove that defense counsel's actions were so deficient that they were unreasonable *and* that the actions prejudiced the result of the trial. (*Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.) In support of his position, defendant relies on the case of *Estelle v. Smith* (1981), 451 U.S. 454, 68 L. Ed. 2d 359, 101 S. Ct. 1866. In *Smith*, the Supreme Court held that a defendant was entitled to *Miranda* warnings before he was questioned by a court-ordered psychiatrist who had been assigned to conduct a neutral competency examination of the defendant after he had been charged. (*Smith*, 451 U.S. at 467, 68 L. Ed. 2d at 371-72, 101 S. Ct. at 1875.) The Supreme Court noted that the psychiatrist essentially became an agent of the State when the psychiatrist testified as to defendant's statements at the penalty phase of the defendant's trial. (*Smith,* 451 U.S. at 467, 68 L. Ed. 2d at 372, 101 S. Ct. at 1875.) Defendant's reliance on *Smith* is faulty. Unlike the defendant in *Smith*, the defendant here had not been charged with the murders and armed robbery before Rice went to visit him. Rice's visit was not court ordered. The purpose of Rice's visit was to assess whether defendant was still suicidal, and not to interrogate defendant about S&S. Thus, defendant did not have the right to be read *Miranda* warnings before Rice spoke with him.

As a general rule, trial counsel's failure to file a motion does not establish incompetent representation, especially when that motion would be futile. (See *People v. Pecoraro* (1991), 144 Ill. 2d 1, 13.) Whether or not to file a motion is a matter of trial strategy which will be accorded great deference. (*People v. Bryant* (1989), 128 Ill. 2d 448, 459.) Defense counsel's failure to file a motion to suppress defendant's statements to Julie Rice did not result in ineffective assistance of counsel.

In addition, defendant has failed to prove that the use of the statements prejudiced the outcome of his trial. The statements which defendant made to Rice did not constitute all of the State's evidence against defendant. The State provided other witnesses who testified that defendant told them that he had committed an armed robbery and shot someone; defendant's own statements about his involvement were also admitted. We cannot say that the result of the trial would have been different had the statements been suppressed.

Defendant also claims that the statements he made to Rice and his journal entry should have been excluded from evidence under the Mental Health and Developmental Disabilities Confidentiality Act (Act) (Ill. Rev. Stat. 1991, ch. 91$^1$/$_2$, par. 801 *et seq.*). Before trial, defense counsel filed a motion *in limine* based on the Act, seeking to preclude use of the statements and journal entry. Defendant asserted that the statements he made to Rice and the journal entry did not relate directly to the facts of a homicide. In denying the motion *in limine*, the trial court judge concluded that the homicide exception applied to both the statements and the journal entry.

The Act provides that "[a]ll records and communications shall be confidential and shall not be disclosed except as provided in this Act." (Ill. Rev. Stat. 1991, ch. 91$^1$/$_2$, par. 803(a).) A communication is "any communication made by a recipient or other person to a therapist or to or in the presence of other persons during or in connection with providing mental health or developmental disability services to a recipient." (Ill. Rev. Stat. 1991, ch. 91$^1$/$_2$, par. 802(1).) An exception provides that records can be disclosed in the investigation and trials of homicides without the consent of the patient "when the disclosure relates directly to the fact or immediate circumstances of the homicide." Ill. Rev. Stat. 1991, ch. 91$^1$/$_2$, par. 810(a)(9).

The admissibility of evidence at trial is a matter within the sound discretion of the trial court. (*People v. Illgen* (1991), 145 Ill. 2d 353, 364.) The trial court's decision to admit evidence will not be overturned absent an abuse of discretion. (*Illgen*, 145 Ill. 2d at 364.) We find that the trial court did not abuse its discretion in allowing the statements made to Rice and defendant's journal entry into evidence.

The oral statements which defendant made to Rice fall within the homicide exception of the Act. Rice's notes and records from her meetings with defendant contain statements that when the police questioned him about S&S defendant responded that four persons could tell that he "did it" and that he would be "buried" if he told who actually committed the murders. Since these statements refer directly to the facts of the S&S homicide, they were admissible under the homicide exception of the Act. Ill. Rev. Stat. 1991, ch. 91$^1$/₂, par. 810(a)(9).

Part of defendant's journal entry which was admitted at trial read as follows:

> "As I lay here in a jail cell some 63 miles from what use to be my home (Springfield, Illinois). I find myself drowning in my own tears over a socalled [*sic*] crime that I didint [*sic*] even commit, but yet here I lay ready to go back to prison, for trying to turn a gun in to what is called the law[.]
>
> All becouse [*sic*] my women wanted to see me become some-one other then the man i [*sic*] use to be, for you see I use to be what you call a stick up man, going out and takeing [*sic*] from others what didnt [*sic*] belong to me.
>
> Couse [*sic*] you see in my life i [*sic*] never did have anything that i [*sic*] could call mine and after my comeing [*sic*] from a worn family who had nougthing [*sic*] to give but it's [*sic*] love I wanted to kind of give back some of the love that was give,en [*sic*] me, as a way of saying thank you, but then yet saying I'm sorry for all the pain that I coused [*sic*] you while growing up."

Although this statement does not use the phrase "S&S," it can be interpreted as referring to the S&S armed

robbery/murders. Defendant was under investigation for and charged with three counts of murder and one count of armed robbery at S&S, and his journal entry explained his reasons for committing armed robberies. Thus, the trial judge did not abuse his discretion in finding that the homicide exception applied to defendant's journal entry.

Finally, defendant claims that the State's Attorney abused the grand jury's subpoena power to obtain Rice's records, which did not contain the journal, and thus his statements to Rice should not have been admitted at trial. The State's Attorney served a subpoena on the McLean County Center for Human Services for production of all clinical records regarding defendant. The subpoena and records were made returnable to the State's Attorney's office, rather than to the grand jury. The subpoena stated that the records were needed by the grand jury in the investigation of a homicide and that the records were related directly to the immediate circumstances of a homicide. The subpoena was not prepared at the direction of the grand jury, but at the direction of the State's Attorney. The State's Attorney claimed that he acted "in anticipation of the grand jury's consideration of matters under investigation" when issuing the subpoenas. The records were never shown to the grand jury. Defendant sought a motion *in limine* to bar the use of the records at trial. The trial court denied this motion, finding that the State's Attorney had issued the subpoena as an agent of the grand jury, that nothing was wrong with the procedure used, and that the State's Attorney had not acted in bad faith.

The grand jury has the power to issue subpoenas to obtain documents relevant to its inquiry when an individual is under investigation for a crime. (Ill. Rev. Stat. 1991, ch. 38, par. 112—4(b).) Grand jury subpoenas are returnable to the grand jury, similar to how a witness, who is subpoenaed by the grand jury, must report to the grand jury. Issues of privilege and relevance of the documents are not relevant at the grand jury stage of an

investigation, since the rules of evidence do not apply. (See *United States v. R. Enterprises, Inc.* (1991), 498 U.S. 292, 298, 112 L. Ed. 2d 795, 805, 111 S. Ct. 722, 726.) The grand jury has the power to disclose subpoenaed documents to the State's Attorney for the purpose of the State's Attorney's furthering his responsibility of enforcing the law. (Ill. Rev. Stat. 1991, ch. 38, par. 112—6(c)(1).) A State's Attorney also has the power to subpoena documents. (Ill. Rev. Stat. 1991, ch. 38, par. 155—2.) These subpoenas, however, should be made returnable to the court, so the court can determine whether the documents are relevant and material, whether the documents are privileged, and whether the subpoena is unreasonable or oppressive before the State's Attorney has access to the documents. See *People ex rel. Fisher v. Carey* (1979), 77 Ill. 2d 259, 265.

The State's Attorney in the instant case misused the grand jury process in obtaining the subpoenas, by substituting his authority to obtain subpoenas for that of the grand jury and by not requiring that the documents be returnable to the grand jury. If proper procedures had been followed, however, the State's Attorney could still have received the documents from the grand jury. Thus, defendant was not prejudiced by the process used to obtain his mental health records.

## TRIAL TESTIMONY

The trial court granted a pretrial motion *in limine* that evidence of defendant's prior armed robbery conviction could not be admitted. Despite this order, Officer Sanders testified that when he was with defendant at the Center after defendant attempted suicide, defendant "started telling me about his past record about having spent thirteen years in prison for an armed robbery. He maxed out and went back in and been out for about two years at that point." At the end of the officer's testimony, defense counsel moved for a mistrial. The court denied

the motion. Defense counsel refused a limiting instruction, stating that the instruction would bring undue notice to the testimony. Defendant now claims that he was denied a fair trial, since the officer's testimony allowed the jury to consider that defendant had a propensity for committing armed robberies.

The court's *in limine* order was inadvertently violated when Officer Sanders testified that defendant had been in prison for 13 years on a prior armed robbery conviction. The error in the introduction of this testimony, however, does not warrant reversal of defendant's conviction. The error was unlikely to have influenced the jury. Officer Sanders' testimony was the only reference to defendant's prior conviction during the whole trial. No additional evidence was admitted as to any facet of the prior conviction; there was no further discussion of the conviction. Moreover, the offer of a limiting instruction regarding this statement was refused. Therefore, Officer Sanders' statement does not warrant a new trial. See *People v. Richardson* (1988), 123 Ill. 2d 322, 343-44.

## THE SENTENCING HEARING

At the first stage of the sentencing hearing, the jury found defendant eligible for the death penalty based on two statutory aggravating factors: (1) murder in the course of an armed robbery, a felony (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(b)(6)) and (2) multiple murder (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(b)(3)). Defendant contends that he was not proven guilty of either of these factors beyond a reasonable doubt. Defendant asserts that most of the evidence indicates that his role in the armed robbery/murders was limited to being a lookout and not the actual killer.

A thorough review of the record indicates that the evidence supports the jury's conclusion that defendant was guilty of the armed robbery and murders. Among all of the evidence presented, Gault testified that shortly after the two men came into the store the taller man

fired a shot. Gault also testified that just after the short man pistol-whipped her, three shots were fired. These three shots resulted in the victims' deaths. The taller man was both identified as defendant and said to look similar to defendant. Defendant also admitted to two of his acquaintances that he committed an armed robbery and murder in Bloomington. These facts support the jury's decision that defendant was guilty beyond a reasonable doubt of committing an armed robbery and three murders, and these facts justify defendant's eligibility for the death penalty.

Next, defendant contends that the death penalty is excessive in light of mitigation evidence of his own circumstances. Defendant asserts that he is mentally retarded, was raised in an unstable family environment, was sexually abused, and has had psychological problems throughout his life. Defendant states that if these factors were considered in determining the appropriateness of the death penalty, the appropriate sentence would have been only natural life imprisonment. Mitigation evidence of a defendant's cognitive abilities and mental health does not preclude imposition of a death sentence when that evidence is outweighed by aggravating evidence. (See *People v. Johnson* (1991), 146 Ill. 2d 109, 144-45.) Three individuals at S&S were killed in cold blood during an armed robbery. In addition, aggravating evidence was presented that defendant threatened a teacher with a hammer at age 12, set fire to a curtain on a school stage, committed an armed robbery of a cab driver, had previously abused and sexually abused his son, had assaulted an 86-year-old convenience store owner during a separate armed robbery, had stabbed a fellow inmate, and had disciplinary action taken against him while he was incarcerated. Although the trial court found almost no mitigating evidence, there is no indication that the trial court failed to weigh the evidence of aggravation against the evidence of mitigation which defendant cites. The court's determina-

tion that the aggravation evidence outweighed the mitigation evidence is supported by the record. There is no evidentiary basis for reversing the trial court's decision to sentence defendant to death.

Defendant also contends that evidence as to his gang affiliation should not have been admitted as evidence in aggravation. Before trial, the court allowed a motion *in limine* that defendant's statements about his own involvement in gang membership were inadmissible. Before the death penalty hearing, the court overruled defendant's objections that evidence of his gang membership was irrelevant and prejudicial at sentencing. At the hearing, Agent Bernardini testified that defendant told him that defendant was a member of the Metro Gangster Disciples and involved in gang activity in Bloomington. Bernardini also testified that he had knowledge of gang activity, and that defendant's information was very accurate and his understanding of gang protocol was good. Defendant now asserts that such evidence was incorrectly admitted at the sentencing hearing.

Defendant has waived this question by failing to raise it as a claim of error in his post-trial motion for a new trial. (See *People v. Enoch* (1988), 122 Ill. 2d 176.) Even if defendant had raised this issue in his post-trial motion, the evidence of defendant's gang affiliation was properly admitted at the sentencing hearing as proof of defendant's character, since it was relevant and reliable. See *People v. Patterson* (1992), 154 Ill. 2d 414, 476; *People v. Salazar* (1988), 126 Ill. 2d 424, 468.

## CONSTITUTIONALITY OF THE SENTENCING HEARING AND DEATH PENALTY

Defendant argues that the death penalty is unconstitutional because it places a burden of proof on the defendant which precludes meaningful consideration of mitigating evidence, and because it does not sufficiently minimize the risk of arbitrary and capricious death sentences. Both of these arguments have been addressed

and rejected by this court on several occasions. (*People v. Henderson* (1990), 142 Ill. 2d 258, 346.) Defendant's arguments fail to persuade us to reconsider this court's previous decisions. Defendant also argues that when the burden of proof is on the defendant and the State is allowed to open and close the sentencing hearing, a defendant is denied a fair and reliable sentencing hearing. This argument was specifically rejected by this court in *People v. Williams* (1983), 97 Ill. 2d 252, 302-03. We see no need to revisit that decision at this time.

## CONCLUSION

For the reasons set out above, we affirm defendant's convictions and sentences. The clerk of this court is directed to enter an order setting Tuesday, March 21, 1995, as the date on which the sentence of death entered by the circuit court of McLean County shall be carried out. Defendant shall be executed in the manner provided by the law. (Ill. Rev. Stat. 1991, ch. 38, par. 119—5.) The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution wherein the defendant is now confined.

*Affirmed.*

JUSTICE HARRISON, dissenting:

Defendant's convictions of murder and armed robbery should be reversed and this cause should be remanded to the circuit court for a new trial. Despite the majority's holding to the contrary, the trial court erroneously denied defendant's motions to suppress statements made to police in violation of the fifth amendment and admitted into evidence defendant's journal entry in violation of the Mental Health and Developmental Disabilities Confidentiality Act.

The trial court determined that *Miranda* warnings were not necessary until defendant was returned to the police station from the crime scene on the morning of June 2. The majority agrees, finding that it was only af-

ter defendant admitted he was to receive $500 for being a lookout that officers should have known that any further questioning would be likely to elicit an incriminating response from defendant. The record shows, however, that the officers had sufficient indication of the incriminating nature of defendant's responses at a much earlier time.

Sometime after 7 p.m. on June 1, when defendant was returned to the police station from the hospital, he was questioned by Detective Katz and Sergeant Bernardini because he claimed to know the perpetrators of the S&S crimes. Bernardini stated that when asked why three people were killed during the S&S robbery, defendant became sullen, put his head in his hands and said that it was a "spur of the moment thing" and that it "wasn't supposed to happen." Defendant's reaction to Bernardini's question was a strong indication that defendant had intimate knowledge of the crime and that further questioning was reasonably likely to incriminate him. Nevertheless, the questioning continued without *Miranda* warnings.

When the officers doubted defendant's claim that he had heard the crime being planned and had followed the robbers to the liquor store, defendant stated that if he told the truth, "he would just be getting himself in deeper," but acknowledged that he was to meet the robbers at 10 p.m. and was hoping to get money after the robbery. The majority claims that the detectives' doubts "were not designed to elicit an incriminating response from defendant." (164 Ill. 2d at 451.) However, given the nature of this admission, if the detectives had not yet concluded that defendant might reasonably be expected to incriminate himself in response to their questions, they could no longer avoid that conclusion. Following *Rhode Island v. Innis* (1980), 446 U.S. 291, 64 L. Ed. 2d 297, 100 S. Ct. 1682, defendant was thereafter under custodial interrogation and any statements he made were subject to the exclusionary rule of *Miranda*. I

would therefore reverse that portion of the trial court's order allowing the use of defendant's unwarned statements made at the police station following his admission that he was to meet the robbers at the time of the robbery and his statements on the trip to the crime scene on the morning of June 2, 1989.

The majority also concludes that defendant was not coerced into making his first written statement, and thus his second written statement on June 2 and his statement to Richard Humber on June 4 were not tainted by the earlier failure of police to provide *Miranda* warnings. I disagree. In *Oregon v. Elstad* (1985), 470 U.S. 298, 84 L. Ed. 2d 222, 105 S. Ct. 1285, the Supreme Court stated:

> "It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, *unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will*, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." (Emphasis added.) *Elstad*, 470 U.S. at 309, 84 L. Ed. 2d at 232, 105 S. Ct. at 1293.

In *Elstad*, the Court determined that the respondent's initial unwarned remark was voluntary, and thus did not taint his subsequent written confession given after he received *Miranda* warnings. The Court believed that neither the environment nor the manner of either interrogation was coercive, pointing out that respondent's first conversation with police took place at midday, in the living-room area of his own home, with his mother in the kitchen, a few steps away. However, there are several distinctions between *Elstad* and the case at bar.

First, in *Elstad* the respondent's warned confession was preceded by an unwarned yet volunteered remark.

Here, however, defendant's warned written statement was preceded by an unwarned written statement. Indeed, as the majority concedes, the second written statement was a mere reiteration of defendant's previous statements. Second, in *Elstad* no deliberately coercive or improper tactics were used to obtain the initial statement. In the present case, however, there is a considerable amount of evidence which would suggest coercion and improper tactics on the part of the police.

The determination of a statement's voluntariness depends on the totality of the circumstances, and consideration must be given to both the characteristics of the accused and the details of the interrogation. (*People v. Simmons* (1975), 60 Ill. 2d 173, 179.) Specific factors to be considered when making a determination of voluntariness include any deception on the part of the police, the age, education and intelligence of the accused, the duration of questioning, and whether he was subjected to any physical punishment. (*People v. Martin* (1984), 102 Ill. 2d 412, 427.) The accused's emotional state and experience in criminal matters are also relevant. *People v. Hester* (1968), 39 Ill. 2d 489, 497.

Here, the record shows that defendant has a severely limited intellectual capacity with a history of mental problems. Additionally, defendant was, at the time of his interrogation, suicidal and depressed, having just returned from the hospital following a suicide attempt in his jail cell. Defendant's interrogation was prolonged, spanning at least 14 hours, and included the pressure of being taken to the scene and pressed to explain weaknesses in his account of the events. (See *Spano v. New York* (1959), 360 U.S. 315, 3 L. Ed. 2d 1265, 79 S. Ct. 1202.) Although there were no direct promises of leniency, the police made statements which raised within defendant the hope of leniency and, particularly, the hope that his cooperation might result in his release. (See *People v. Ruegger* (1975), 32 Ill. App. 3d 765, 769.) Moreover, defendant was led to believe that the police

possessed evidence of his footprint at the crime scene, prompting defendant to admit that he had been inside the store. The Supreme Court has stated that "any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege [against self-incrimination]." *Miranda*, 384 U.S. at 476, 16 L. Ed. 2d at 725, 86 S. Ct. at 1629.

It is true that defendant was not physically abused and was given food and permitted to use the rest room during breaks in his interrogation. Nor was defendant young or inexperienced in criminal matters, although it is questionable whether a 44-year-old man with an IQ estimated between 67 and 87 can be expected to have learned from experience. Nevertheless, from an examination of the "surrounding circumstances and the entire course of police conduct" with respect to defendant (*Elstad*, 470 U.S. at 318, 84 L. Ed. 2d at 238, 105 S. Ct. at 1298), it is clear that the manner of interrogation was coercive. Therefore, the administration of *Miranda* warnings prior to defendant's subsequent written and oral statements did not cure the condition that rendered the unwarned statements inadmissible. (See *In re T.S.* (1986), 151 Ill. App. 3d 344, 353 (written confession of 15-year-old arson suspect was inadmissible despite *Miranda* warnings where it immediately followed and reiterated unwarned oral confession obtained pursuant to intimidating, coercive and deceptive interrogation).) Accordingly, the trial court committed reversible error in failing to suppress the tainted statements made by defendant on June 2 and 4. See *In re T.S.*, 151 Ill. App. 3d 344.

Reversible error also occurred when a portion of defendant's confidential statements to a mental health therapist was admitted in violation of the Mental Health and Developmental Disabilities Confidentiality Act (the Act) (Ill. Rev. Stat. 1991, ch. 91$^{1}$/$_{2}$, par. 801 *et seq.*). While I agree with the majority that the oral statements which defendant made to Julie Rice fall within the homicide

exception of the Act, the majority's conclusion that defendant's journal entry was similarly admissible is contrary to the obvious intent of the statute.

The exception contained in section 10(a)(9) of the Act states: "Records and communications of the recipient may be disclosed in investigations of and trials for homicide when the disclosure relates directly to the fact or immediate circumstances of the homicide." (Ill. Rev. Stat. 1991, ch. 91¹/₂, par. 810(a)(9).) As the appellate court aptly stated in *People v. Doe* (1991), 211 Ill. App. 3d 962, 967:

"The legislature intentionally included the words 'directly' and 'immediate' in this exception. (See *Rosewood Corp. v. Transamerica Insurance Co.* (1972), 8 Ill. App. 3d 592, 290 N.E.2d 656 (terms expressly stated in a statute were intended by legislature), *aff'd* (1974), 57 Ill. 2d 247, 311 N.E.2d 673.) Therefore, a showing that the disclosure merely relates to the circumstances of a homicide is not sufficient to invoke the exception. There must be a showing that the disclosure *directly* relates to the *immediate* circumstances of the homicide." (Emphasis in original.)

There has been no such showing made in this case.

The majority contends that although defendant's journal entry "does not use the phrase 'S&S,' it can be interpreted as referring to the S&S armed robbery/ murders," and was admissible because it "explained his reasons for committing armed robberies." (164 Ill. 2d at 457.) However, defendant's journal entry merely states that he "use to be *** a stick up man." Because defendant has at least one prior robbery conviction, it is entirely possible that the journal entry did not refer to the crime in question. Construing the homicide exception so broadly as to include defendant's vague references to former bad acts violates the Act's clear prohibition against revealing mental health clients' records and communications. These statements were not directly related to the fact or immediate circumstances of the S&S homicides. The admission of defendant's journal entry into evidence was therefore erroneous and prejudicial and defendant should be entitled to a new trial.

For the foregoing reasons, I must dissent.