**Howard WILSON, Petitioner–Appellant,**

v.

**Odie WASHINGTON, Respondent–Appellee.**

No. 96–3260.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 3, 1997.

Decided Feb. 25, 1998.

Rehearing and Suggestion for Rehearing En Banc Denied March 27, 1998.

David B. Mote (argued), Office of the Federal Public Defender, Springfield, IL, Richard H. Parsons, Office of the Public Defender, Peoria, IL, for Petitioner–Appellant.

Karen Kavanagh (argued), Catherine Glenn, Office of the Attorney General, Criminal Appeals Division, Chicago, IL, for Respondent–Appellee.

Before CUDAHY, EASTERBROOK, and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

Perhaps Howard Wilson lied to protect his brothers, perhaps he lied to protect himself. Regardless of his motives, had Wilson told the truth about the 1988 triple murder at S & S Liquors in Bloomington, Illinois, there's a chance he might be a free man today. Instead, Wilson now sits in an Illinois prison serving three concurrent life terms for first degree murder and a concurrent 5–year term for perjury.

In this federal habeas petition (filed pursuant to 28 U.S.C. § 2254) Wilson sought release on the grounds that his state prosecution violated an informal grant of immunity

contained in a letter written to him by Charles Reynard, the chief prosecutor in Mc-Lean County, Illinois. Wilson claims that Reynard exchanged immunity for Wilson's testimony before a grand jury in 1991. Whether or not that document constituted a grant of immunity, Wilson violated the terms of the arrangement by lying to the grand jury—lies that eventually led to his convictions.

Wilson's conviction ended 5 years of grueling investigation following the killings at S & S Liquors.[1] Howard Wilson's trial was the last of three murder trials. During the first 3 years of the inquiry the police and prosecutor met only with dead ends—Howard Wilson's lies and the lies of many others blocked most police efforts to map out the events of October 27, 1988.[2]

The painstaking police work involved in the S & S investigation contrasts starkly with the unplanned and random nature of the crime itself. At around 10 p.m. on October 27, Glenn Wilson and Alvin Alexander—Howard Wilson's half-brothers—entered S & S Liquors. They were drunk, high on cocaine, and armed with .22 caliber pistols supplied by Howard. Alvin and Glenn ordered the two clerks (Tracey Gault and Robert Webb) and the two customers (Allen Burton and Whitney Cole) to lie face down on the floor with their hands behind their heads. Before Gault could lie down, Alvin forced her to give him the money from the register. Then he ordered her to open the safe. After she handed over the cash he struck her with his gun and threatened her. While Alvin dealt with Gault, Glenn executed Webb, Burton, and Cole by firing a single bullet into the back of each of their heads.

The State's chief witness, Glenn's girl friend Margaret Wilson (who is not related to either Glenn or Howard Wilson—her last name is a coincidence), drove one of the two getaway cars. Margaret testified that earlier in the evening Howard brought three guns to Glenn's house in a small blue gym bag. Margaret also said that Howard walked with Glenn and Alvin from the cars to the S & S—although she did not see what he did at the store. The prosecution theorized that Howard served as the lookout because Gault did not see him inside the S & S.

Howard Wilson eventually confessed that he drove the other getaway car, but he claimed that he did not know that Alvin and Glenn committed any crimes inside the liquor store. Furthermore he denied supplying all three guns, although he did admit to giving a gun to Alvin who, a day before, said that he needed a gun in order to make some fast money. Howard understood this to mean that Alvin intended to commit a robbery; nevertheless, Howard gave him a .22 pistol. Howard told the 1991 grand jury that Alvin returned the gun later that same day. At trial Howard conceded that Alvin did not return the .22 until 2 weeks after the S & S murders.

At first the investigation of the S & S murders stalled because neither Gault nor other witnesses who saw men fleeing the store could identify the perpetrators. The first major break in the case seemed to come in June of 1989 with the arrest of Glenn Wilson on unrelated charges. Glenn offered to provide information on the S & S murders. While Glenn's information proved false, his deception backfired by revealing his detailed knowledge of the crime.

1. The 5 years wore heavily on everyone involved. The police detectives assigned to the S & S investigation, the prosecutor, and the defense attorneys all found themselves consumed by the case. *See* Steve Arney, *S & S Investigation Dominated Bloomington Detectives' Time,* The Pantagraph (Bloomington, Ill.), July 19, 1993, at A2; Bob Holliday, *S & S Defense Lawyers Struggled With Pressure,* The Pantagraph (Bloomington, Ill.), July 19, 1993, at A1; Scott Richardson, *Reynard Gained Strength from Families in S & S Case,* The Pantagraph (Bloomington, Ill.), July 18, 1993, at A1.

2. The lack of progress led authorities to offer, and eventually pay out, an extraordinary "Crimestoppers" reward for information leading to the conviction of the S & S murderers. *In S & S Case: $25,000 Reward Payout Believed Largest in Illinois,* The Pantagraph (Bloomington, Ill.), May 7, 1993, at A1 (Crimestoppers of McLean County gave three anonymous awards of $15,000, $7,500, and $2,500. After Crimestoppers offered the S & S reward it capped the maximum amount per case at $1,000.).

After police focused on Glenn, the case against the Wilson family slowly took shape. Over the course of the next 2 years a jailhouse informant reported that Glenn bragged about his involvement in the S & S crimes; two of Alvin's friends stated that he told stories about the murders during a trip to Peoria; and, most importantly, Margaret Wilson agreed to plead guilty to perjury for her lies to a grand jury and to testify for the government in exchange for the State dropping murder and robbery charges against her.

By 1991 the police gathered enough evidence for Reynard to charge Glenn and Alvin with the S & S murders. Glenn went to trial in April of 1992—he was convicted and sentenced to death. Alvin stood trial in July of 1992—he, too, was convicted, but he received a life sentence.

As Reynard and the police built their cases against Glenn and Alvin they also learned that Howard Wilson lied in his early attempts to establish an alibi for the night of the murders. In 1989 Howard misdirected police by telling them that he was in New Mexico working for CRST trucking at the time of the crime. The detectives learned that CRST terminated Howard on October 24, 3 days before the murders, because he was involved in an accident. As the police continued to question Howard, further inconsistencies appeared, and the detectives began to suspect that he played a significant role in the crime.

In the summer of 1991 Reynard and his assistant, Teena Griffin, sought Howard Wilson's help in bringing Glenn and Alvin to justice. At the time, the prosecutors suspected that Howard could put his relatives in prison for the S & S murders, but they remained unclear about the depth of his involvement in the murders.

On July 31, 1991, Wilson reluctantly answered a grand jury subpoena. He appeared without an attorney but then complained about testifying because he was concerned about being blamed for something he didn't do. To placate Wilson and to gain his testimony, Reynard orally assured him. Wilson still hesitated about going before the grand jury. As Reynard recalled, Wilson never explicitly refused to testify. "He was certainly reluctant. It would be fair to say that he was reluctant and wanted something from us. Perhaps inferentially one can conclude that he would not have cooperated voluntarily and appropriately . . . ." Griffin testified that Wilson stated "that before he would really want to talk he wanted something in writing." To gain Wilson's testimony, the prosecutor and his assistant prepared the following letter:

July 30, 1991

Re: S & S Murder Investigation

Dear Mr. Wilson:

This letter will acknowledge that State's Attorney Charles Reynard and Assistant State's Attorney Teena Griffin have met with Howard Wilson today pursuant to Mr. Wilson's Grand Jury Subpoena for the grand jury investigation involving the S & S Murder which occurred on October 27, 1988. Mr. Reynard and Ms. Griffin hereby acknowledge that they have represented to Mr. Wilson that Mr. Howard Wilson is NOT a target of the grand jury investigation. The State's Attorney's Office will NOT be asking the grand jury to return any indictments against Howard Wilson. The State's Attorney's Office does not possess any evidence that implicates Howard Wilson as being physically involved in the S & S armed robbery and murders. The State's Attorney's Office is only interested in the information Howard Wilson has about the S & S case which he personally observed or was told by others who were involved.

Very truly yours,

[Notarized signatures of prosecutors Reynard and Griffin]

Both Reynard and Griffin testified that they gave "assurances" on other occasions, but they acknowledged that the prosecutor's office had never previously prepared such a letter at the grand jury stage of an investigation. They also said they had never before produced such a letter for an unrepresented witness. As Griffin stated, "I've done letters to defendants or potential suspects at the request of defense attorneys who say they have information and want some kind of as-

surance." The prosecutors swore to the document because, as Reynard remembered, "Mr. Wilson wanted it to be a sworn statement from us, otherwise it wouldn't be any good."

After receiving the letter, Wilson appeared before the grand jury. Reynard began the proceeding with, "I have a question Howard. When you came here today you had some concerns about getting roped into this yourself?" Next Reynard referred to an "arrangement" with Wilson and asked, "As part of the arrangement you promise to come in and tell the truth?" Then Reynard queried, "You understand that the arrangement does not apply if you're not telling the truth?" Eventually Reynard wrapped up these introductory matters and Wilson testified-untruthfully.

Several months later, in January of 1992, Wilson proposed a formal deal—he offered to turn state's evidence. This time a defense attorney assisted Wilson by negotiating a detailed immunity agreement. Wilson promised to cooperate without telling "even one lie," and he pledged to pass a lie detector test. In exchange, the State agreed not to "prosecute Howard 'Monkey' Wilson for involvement in the S & S crimes or for perjury previously committed." Wilson did not tell the truth, nor did he pass the polygraph.

By August of 1992 Reynard had built a strong enough case against Wilson to charge him with the S & S murders. Reynard also charged Wilson with perjury for his lies to the 1991 grand jury. Wilson went to trial in March of 1993 and the jury convicted him on all counts. For Bloomington, Illinois, Wilson's conviction ended the saga of the S & S murders.[3]

After 1993 the S & S story moved into the realm of the appellate courts.[4] Howard Wilson appealed his conviction and lost. *See*

*People v. Wilson*, 271 Ill.App.3d 943, 208 Ill.Dec. 716, 649 N.E.2d 1377 (Ill.App.Ct.), *appeal denied*, 163 Ill.2d 584, 212 Ill.Dec. 435, 657 N.E.2d 636 (1995). Wilson then filed a *pro se* habeas petition in McLean County circuit court. The state court dismissed the petition for failure to comply with Illinois law. *See* 735 ILCS 5/10–104. Next Wilson filed a pro se habeas petition in the district court for the Central District of Illinois, and the court appointed the federal public defender to represent Wilson. Judge Joe Billy McDade denied an amended habeas petition on August 7, 1996. Wilson now appeals to this court. We review the case under the old law, *Lindh v. Murphy*, —— U.S. ——, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), because Wilson's original petition was filed before the Antiterrorism and Effective Death Penalty Act of 1996 took effect.

The essence of Wilson's argument is that the July 31, 1991, letter constituted an informal grant of transactional immunity. He contends that his subsequent prosecution breached the immunity agreement and violated his constitutional rights to due process. In resolving the issue, the district court and the parties focus on the meaning of the phrase "*the* grand jury" in the July letter. This debate epitomizes why a lot of people hate lawyers. Only lawyers would ignore all common sense and dispute the meaning of "the." Before we can consider common sense, however, we must first wade through some preliminary legal arguments.

■ Illinois attacks Wilson's petition on procedural grounds, claiming we should not reach the substantive arguments. Wilson, the State contends, did not frame the immunity claim as an issue under the Constitution when he presented the question to the Illinois courts. Wilson did, however, raise the immunity claim. Thus, we do not ask wheth-

---

**3.** As far as Bloomington was concerned, 1993 marked the end of the S & S case in more ways than one. On January 1, 1993, S & S Liquors closed its doors after a week-long going out of business sale. *S & S Murders Chronology*, The Pantagraph (Bloomington, Ill.), May 1, 1993, at A1.

**4.** Glenn Wilson lost his appeal and the Supreme Court denied certiorari. *See People v. Wilson*,

164 Ill.2d 436, 207 Ill.Dec. 417, 647 N.E.2d 910 (1994), *cert. denied*, 516 U.S. 876, 116 S.Ct. 204, 133 L.Ed.2d 137 (1995). Alvin Alexander lost his appeal to the Illinois Appellate Court, and the Illinois Supreme Court denied his motion for leave to appeal. *See People v. Alexander*, 259 Ill.App.3d 1043, 221 Ill.Dec. 175, 674 N.E.2d 1280 (Ill.App.Ct.), *appeal denied*, 157 Ill.2d 506, 205 Ill.Dec. 169, 642 N.E.2d 1286 (1994).

er he procedurally defaulted by failing to raise a claim at all. *See Hogan v. McBride,* 74 F.3d 144, 146 (7th Cir.1996). Instead, we inquire whether Wilson framed his claim in terms of federal law. *See Anderson v. Harless,* 459 U.S. 4, 6, 103 S.Ct. 276, 277, 74 L.Ed.2d 3 (1982).

The district court examined the facts and history of Wilson's claim and reasoned that Wilson clearly implicated due process by alleging that the State offered him immunity but then reneged and prosecuted him:

> It is beyond question that, in our system of justice, any agreement made by the government must be scrupulously performed and kept. *United States v. Cahill,* 920 F.2d 421, 425 (7th Cir.1990), *cert. denied,* 500 U.S. 934, 111 S.Ct. 2058, 114 L.Ed.2d 463 (1991). Due process warrants that the prosecution of a defendant based on direct or indirect testimony taken after a specific promise of immunity will result in dismissal of the indictment. *Id.*

We agree with Judge McDade. Thus, we reach the substantive merits of this case, where we unfortunately walk straight into a thicket of legalistic, picayune arguments regarding the meaning of the July 31, 1991, letter.

■ The State argues that the letter constitutes no more than a routine assurance by the prosecutor that Wilson was not a suspect in a pending investigation: "It is obvious that the Letter was intended to clarify for Petitioner that the purpose of his subpoena before the grand jury was not to indict him, but rather to have Petitioner testify as to his knowledge of the crimes." Illinois contends that *United States v. Cahill,* 920 F.2d 421, 426 (7th Cir.1990), stands for the proposition that immunity does not spring into existence because of a witness's reliance on a prosecutor's statement that the witness was not then the subject of an investigation. The State notes that Wilson and the prosecutor did not explicitly discuss immunity. Finally, the State adds that the subsequent formal immunity agreement supports its interpretation of the letter—if the State already gave Wilson immunity, then he had no logical need to secure another immunity agreement.

We do not decide whether the letter constituted an immunity agreement or whether it merely amounted to an "assurance" (whatever that means). We do believe, however, that the letter represented a deal between Wilson and the prosecutor—as Reynard referred to it, an "arrangement." While Illinois attempts to minimize the importance of the letter and to reduce it to a hollow gesture used to placate an unsophisticated and unrepresented witness, several factors militate in favor of taking it much more seriously. The letter goes far beyond simple assurances; it repeatedly declares what the State will NOT do. It is signed ("Very truly yours," no less) and it is sworn. As Reynard explained, Howard Wilson believed that the letter would not be "any good" unless Reynard swore to it. Without counsel, Wilson certainly did not know that an empty promise not to seek his indictment before the July grand jury would not do him "any good" either.

More importantly, however, we look to the circumstances leading up to the preparation of the letter—the prosecutors could obtain nothing useful from Wilson because of his reluctance to testify. Reynard acknowledged that "perhaps inferentially one can conclude" that Wilson would not have testified without the letter, and Griffin admitted that Wilson "wanted something in writing" before he would talk.

All of these considerations underscore the fine line a prosecutor walks if he writes such a letter for a reluctant witness worried about implicating himself by testifying. While we do not reach the question of whether this letter created an immunity offer, we caution prosecutors about the cavalier use of such "assurances." The State must deal honorably, and a prosecutor's pledge creates a commitment.

This all leads us back to the central question: Under the arrangement, what did the State owe to Howard Wilson? The parties and Judge McDade focus on semantics. They bring their impressive hermeneutical skills to bear on the minutiae of the document, examining the wording of the letter and attempting to discern its meaning. Judge McDade read the letter as a limited

grant of immunity. He focused on the letter's repeated references to "the grand jury," which he understood to mean only that one specific grand jury, not any grand jury. Accordingly, Judge McDade ruled that Illinois complied with the narrow scope of the letter by not indicting Wilson in the summer of 1991. Crucially, he explained the letter did not bar the state's attorney from prosecuting Wilson in the future. As Judge McDade explained:

> References to "the" grand jury can reasonably be understood to mean the particular grand jury already assembled at that time. The agreement cannot reasonably be read to refer to any future grand jury that might be convened upon further investigation of Wilson's involvement in the crime. ... Thus, because the grand jury already assembled at the time of the agreement did not indict Wilson, the State lived up to its obligations under the July 31, 1991 immunity agreement and Wilson has no due process claim.

The State follows up on Judge McDade's reasoning by explaining that the letter conferred only limited use immunity. While the State did prosecute Wilson for his perjurious statements to the grand jury, Illinois did not violate the agreement because immunity does not cover perjury. *See In re Bonk*, 527 F.2d 120, 125 (7th Cir.1975).

Wilson responds by urging us to interpret the letter as a matter of law. As Wilson explains, immunity agreements are simple contracts interpreted under basic rules of contract interpretation. *United States v. Osborne*, 931 F.2d 1139, 1162 (7th Cir.1991). Wilson argues that this court may find ambi-

guity in such a document as a matter of law. *See United States v. Harvey*, 791 F.2d 294, 301 (4th Cir.1986) (finding a plea agreement ambiguous as a matter of law). Wilson, therefore, exhorts us to find the letter ambiguous and to construe it against the State. *See United States v. Dudden*, 65 F.3d 1461, 1467 (9th Cir.1995) ("If there is any ambiguity in the language of the immunity agreement, the ambiguity will be resolved against the government."); *People v. Weilmuenster*, 283 Ill.App.3d 613, 219 Ill.Dec. 124, 670 N.E.2d 802, 810 (Ill.App.Ct.1996) ("Where the evidentiary record discloses ambiguity in the scope of the government's agreement to confer immunity, basic considerations of fairness dictate that any ambiguity be resolved in favor of the defendant.").

While we might differ with Judge McDade's narrow construction of "the" as an article that refers universally to a unique item rather than occasionally to a class of items, we refuse to resolve this case by resorting to semantics. Nor will we construe the letter as an ambiguous agreement and reward Howard Wilson for his misconduct.[5]

Similarly we will not engage in semantic squabbling over whether the letter was an arrangement, an agreement, or a contract. Common sense dictates that at the most, the letter chronicled a bargain by which the prosecutor swapped some kind of protection for Wilson's truthful testimony about the S & S murders. While the letter does not explicitly spell out Wilson's end of the bargain, it clearly contemplated that Wilson would testify truthfully while under oath. Thus, regardless of what the State offered as its part of the deal, Wilson violated the agreement by

---

**5.** Speaking of Wilson's misconduct, given his reluctance to speak honestly before trial, his behavior at trial revealed remarkable candor. Ironically, in court Wilson seemed unable to keep his true feelings bottled up. During one dull moment in the trial Wilson wrote Detective Daniel Katz a threatening note "just to be doing something." The note read: "You forget, I've been to your house Katz and I know where your little girl goes to school.... You're a walking dead man, I promise you that." As sheriff's deputies searched Wilson for other notes, he threatened, "If that punk puts his hands on me, then I will break him in half.... I am a gladiator." On another occasion, when Reynard moved to limit the number of defense witnesses, Wilson com-

plained that "this ain't no Watergate." During Wilson's testimony he accused Reynard of being a "f...ing racist." At some point in the trial Wilson lost telephone privileges after calling Springfield to ask a friend to drive by Reynard's house to "show him who he's dealing with." *See* several articles on the Howard Wilson trial by Melinda Zehr in The Pantagraph (Bloomington, Ill.), Mar. 21–26, 1993. Finally, at sentencing, when Reynard mentioned Wilson's large extended family, Howard said, "Yeah, remember that when you go to sleep at night." Scott Richardson, *Combative Howard Wilson Sentenced to Life,* The Pantagraph (Bloomington, Ill.), May 1, 1993, at A1.

lying to the grand jury. In the language of contract law, Wilson committed a material breach, and that excused the State from performance. *See United States v. Crawford*, 20 F.3d 933, 935 (8th Cir. 1994). This case goes down on the simple grounds that Wilson broke his end of the bargain. He had two chances to tell the truth. Both times he choked on his own words, so to speak.

AFFIRMED.