Glenn WILSON, Petitioner,

v.

James SCHOMIG, Warden, Respondent.

Case No. 01–1174.

United States District Court, C.D. Illinois.

Oct. 28, 2002.

Richard McLeese, Chicago, IL, for Plaintiff.

Michael Glick, Office of the Attorney General, Chicago, IL, for Defendant.

### ORDER

MIHM, District Judge.

Now before the Court is Petitioner, Glenn Wilson's ("Wilson"), Amended Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. For the reasons set forth below, his Amended Petition is DENIED.

### Background

At approximately 10:00 p.m. on October 27, 1988, Wilson and his younger half-brother, Alvin Alexander ("Alexander"), went to the S & S Liquor Store in Bloomington, Illinois, to commit a robbery. They had apparently been free basing cocaine prior to the robbery and set out to rob the liquor store to get money to buy more cocaine. According to the testimony of Tracy Gault ("Gault"), an S & S employee and the only surviving witness that night, two customers and another store employee, Robert Webb ("Webb"), were ordered to lie down on the floor and she was ordered to open the cash register. After Alexander took the money from the register, Gault was ordered to open the safe and hand the money in it to Alexander. Alexander then hit her in the face with his gun, knocking her glasses off and causing her to bleed; Gault then crouched against the wall. She heard three gunshots, and then the store became quiet. After about 30 seconds, Gault crawled out from near the safe and noticed that the female customer had blood coming from her mouth. She then called 911.

When the police arrived, the male customer was already dead, but the female customer and Webb were still breathing. Webb and the female customer subsequently died, with the cause of death for each of the three victims being a gunshot wound to the head.

On June 1, 1989, Wilson was arrested on an unrelated charge. However, during the first eight days that he was in custody, he made several statements to the police regarding the S & S murders. He was ultimately charged with six counts of murder and one count of armed robbery in the Circuit Court for McLean County, Illinois.

On July 25, 1992, a jury in the Circuit Court of McLean County convicted Wilson on three counts of first degree murder and the one count of armed robbery. At the first stage of the death penalty hearing, the same jury found him eligible for the death penalty on the basis of multiple murder and murder in the course of a forcible felony. At the second stage of the hearing, Wilson waived his right to a jury and proceeded before the trial judge, who

found that there were no sufficient mitigating factors to preclude the imposition of the death sentence. He was sentenced to death and a term of 30 years for the armed robbery conviction.

Wilson filed an appeal with the Illinois Supreme Court, raising 11 claims of error: (1) the statements that he made to police should have been suppressed at trial since *Miranda* warnings were not given and the police interrogation was coercive; (2) defense counsel was ineffective for failing to claim that the statements Petitioner made to a county mental health therapist were involuntary and the result of coercion; (3) statements that Petitioner made to a county mental health therapist were erroneously admitted into evidence in violation of the Mental Health and Developmental Disabilities Act; (4) the State's Attorney incorrectly issued subpoenas without the direction of the Grand Jury or the supervision of the court; (5) he was denied a fair trial by the use of evidence of his prior armed robbery conviction in spite of a motion in limine; (6) he was not proven eligible for the death penalty beyond a reasonable doubt; (7) the sentence of death was excessive; (8) the use of aggravation evidence of his gang membership violated his constitutional rights; (9) the trial court denied Petitioner a fair sentencing hearing by refusing to limit the State to one closing argument; (10) the Illinois death penalty statute is unconstitutional because it places a burden of proof on the defendant which precludes meaningful consideration of mitigation; and (11) the Illinois death penalty statute is unconstitutional because it does not sufficiently minimize the risk of arbitrarily or capriciously imposed death sentences. On December 24, 1994, the Illinois Supreme Court affirmed Wilson's convictions and sentences. His Petition for Rehearing was denied on April 3, 1995, and a Petition for Writ of Certiorari to the United States Supreme Court was also denied.

Petitioner filed a pro se petition for post-conviction relief with the circuit court that raised seven arguments: (1) trial counsel was ineffective for failing to investigate an alibi witness; (2) trial and appellate counsel were ineffective for failing to argue that an in-court identification violated his due process rights because he was the only black man in the courtroom; (3) Petitioner's right to be present at all critical stages of his trial was violated when jurors were interviewed and one dismissed out of his presence and trial and appellate counsel were ineffective for failing to argue this claim; (4) the right to an impartial jury was violated when a juror was dismissed for not revealing a prior relationship with the mother of one of the murder victims and for talking to other jurors about news stories about the trial; (5) trial and appellate counsel were ineffective for failing to recognize that a fitness hearing was required since Petitioner was given psychotropic drugs before and during trial and sentencing; (6) the right to present witnesses was violated when prosecutors intimidated Margaret Wilson to keep her from testifying; and (7) appellate counsel was ineffective for failing to argue that the trial court had erred in denying the motion to preclude the State from seeking the death penalty. The circuit court then appointed counsel to represent Wilson, and his counsel filed an amended petition, which raised only four claims of error: (1) he was denied effective assistance of counsel at the hearing on his motion to suppress statements where his attorney failed to request that he be examined by a psychologist and that a psychologist be appointed to aid in the preparation for the hearing; (2) he was denied effective assistance of counsel where counsel failed to retain an expert and to present psychological and psychiatric evidence in

defense; (3) he was denied effective assistance of counsel at his death penalty hearing where his attorney failed to request that he be examined by a psychologist or psychiatrist to aid in the preparation for the hearing and presentation of evidence in mitigation, and further failed to investigate and present a witness in mitigation; and (4) he was denied effective assistance of appellate counsel where his attorney failed to raise the issue that the State was precluded from seeking the death penalty. After a hearing, his petition for post-conviction relief was dismissed.

Petitioner then pursued an appeal from this denial in which he presented five claims: (1) the trial court abused its discretion in denying the defense's request for funds; (2) the trial court erred in dismissing the petition; (3) Petitioner was denied the effective assistance of appellate counsel when counsel failed to argue that the State was precluded from seeking the death penalty; (4) the trial court arbitrarily and capriciously imposed a premature deadline for filing the amended petition; and (5) the Illinois Supreme Court should adopt a uniform test governing when an expert should be appointed during both trial and post-conviction proceedings. On May 18, 2000, the Illinois Supreme Court affirmed the circuit court's denial of funds to hire an expert and dismissal of Wilson's post-conviction petition. His request for rehearing was denied on July 3, 2000, and a Petition for Writ of Certiorari to the United States Supreme Court was also denied.

Wilson filed the present Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, in which he presents essentially four claims for relief: (1) trial counsel provided ineffective assistance at Petitioner's capital sentencing hearing by failing to investigate and present significant mitigating evidence, including evidence relating to Wilson's organic brain dysfunction; (2) the trial judge erred in failing to suppress all of Petitioner's statements to law enforcement officers on *Miranda* grounds; (3) trial counsel provided ineffective assistance in not challenging the admissibility of Wilson's statements to law enforcement officers on the grounds that they were involuntary and the result of coercion and in failing to seek the suppression of statements Wilson made to a county mental health therapist on *Miranda* grounds; and (4) Illinois' death penalty system has pervasive constitutional flaws. The matter is now fully briefed, and this Order follows.

## Legal Standard

Before reaching the merits of a petition for writ of habeas corpus brought pursuant to 28 U.S.C. § 2254, a district court must consider "whether the petitioner exhausted all available state remedies and whether the petitioner raised all his federal claims during the course of the state proceedings." *Farrell v. Lane*, 939 F.2d 409, 410 (7th Cir.1991), *quoting Henderson v. Thieret*, 859 F.2d 492, 496 (7th Cir.1988). If the answer to either of these questions is "no," then the failure to exhaust state remedies or procedural default bars the petition. *Id.* In other words, if a petitioner fails to give the state courts a full and fair opportunity to review his claims, then his petition must fail. *Bocian v. Godinez*, 101 F.3d 465, 468–69 (7th Cir.1996).

■ Exhaustion of a federal claim occurs when it has been presented to the highest state court for a ruling on the merits or when it could not be brought in state court because a remedy no longer exists when the federal petition is filed. *Id.* In the present case, Respondent does not argue that Petitioner has failed to exhaust his state remedies.

■ Procedural default occurs when a claim could have been but was not presented to the state court and cannot, at the time the federal petition is filed, be presented to the state court. *Resnover v. Pearson*, 965 F.2d 1453, 1458 (7th Cir. 1992). This occurs in one of two ways. First, a procedural default may occur when a petitioner fails to pursue each appeal required by state law, *Jenkins v. Gramley*, 8 F.3d 505, 507–08 (7th Cir. 1993), or when he did not assert the claim raised in the federal habeas petition in the state court system. *Resnover*, 965 F.2d at 1458–59. The second way in which a petitioner may procedurally default a claim is when a state court disposes of the case on an independent and adequate state law ground, regardless of whether that ground is substantive or procedural. *Coleman v. Thompson*, 501 U.S. 722, 111 S.Ct. 2546, 2553–55, 115 L.Ed.2d 640 (1991).

■ Federal review is barred for claims that are procedurally defaulted unless the petitioner can demonstrate cause and prejudice. *Engle v. Isaac*, 456 U.S. 107, 102 S.Ct. 1558, 1572–73, 71 L.Ed.2d 783 (1982); *Farrell*, 939 F.2d at 411. Review in federal court is also possible if otherwise a fundamental miscarriage of justice would occur in that a constitutional error probably resulted in the conviction of someone who is actually innocent. *Schlup v. Delo*, 513 U.S. 298, 115 S.Ct. 851, 864–67, 130 L.Ed.2d 808 (1995).

With respect to claims that are not barred either for failure to exhaust or procedural default, federal courts must employ a strict analysis. A petition must be denied with respect to any claim previously adjudicated on the merits in a state court unless the decision of the state court:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). *See also Lindh v. Murphy*, 96 F.3d 856, 868–71 (7th Cir. 1996), *rev'd on other grounds*, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).

■ Subsection (d)(1) instructs that Supreme Court precedent governs legal questions. *Id.* at 869. In resolving mixed questions of law and fact, relief is unavailable unless "the state's decision reflects an unreasonable application of the law," meaning federal courts are to have a hands-off attitude unless the state court judgment is premised on an unreasonable error. *Id.* at 870 (internal quotation marks omitted). A responsible, thoughtful decision that is made after a full opportunity to litigate suffices, "even if it is wrong." *Id.* at 871, 876–77. Subsection (d)(2) pertains to a decision constituting an unreasonable determination of the facts, and, according to 28 U.S.C. § 2254(e)(1), factual issues are presumed to be correctly resolved. A petitioner must rebut this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

### Discussion

As previously stated, Wilson presents essentially four claims in his Amended Petition: (1) trial counsel provided ineffective assistance at Petitioner's capital sentencing hearing by failing to investigate and present significant mitigating evidence, including evidence relating to Wilson's organic brain dysfunction; (2) the trial judge erred in failing to suppress all of Petitioner's statements to law enforcement officers on *Miranda* grounds; (3) trial counsel provided ineffective assistance in not challenging the admissibility of Wilson's state-

ments to law enforcement officers on the grounds that they were involuntary and the result of coercion and in failing to seek the suppression of statements Wilson made to a county mental health therapist on *Miranda* grounds; and (4) Illinois' death penalty system has pervasive constitutional flaws. Each argument will be addressed in turn.

## I. Wilson's First Claim is Without Merit

In his first claim, Wilson alleges that his trial counsel provided ineffective assistance during his sentencing hearing. The seminal case on ineffective assistance of counsel is *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In *Strickland,* the Court stated that in order for a prisoner to demonstrate that counsel's performance fell below the constitutional standard, the petitioner would have to show that "counsel's representation fell below an objective standard of reasonableness." *Strickland,* 466 U.S. at 687–88, 104 S.Ct. 2052. A prisoner must also prove that he has been prejudiced by his counsel's representation by showing "a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. The courts, however, must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 690, 104 S.Ct. 2052. "Judicial scrutiny of a counsel's performance must be highly deferential" and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689, 104 S.Ct. 2052.

▇ Wilson argues that he suffers from myriad major mental-health problems, including organic frontal-lobe brain dysfunction, which has many behavioral correlates that are purportedly relevant to his homicidal behavior in this case. He contends that his trial counsel failed to investigate and present mitigating evidence relating to this dysfunction at his capital sentencing hearing and also failed to present evidence from a long-time friend, Michele Ritza ("Ritza"). However, Wilson makes no reference to a claim regarding the testimony of Ritza in either his Memorandum or Traverse. Accordingly, this aspect of his argument is waived, and only the purported failure to present mitigating evidence relating to his organic frontal-lobe brain dysfunction will be addressed.

Wilson raised the issue of ineffective assistance of counsel for failure to investigate and introduce evidence of his mental health condition as mitigation on appeal from the denial of his post-conviction petition. In addressing this claim, the Illinois Supreme Court held:

> Defendant alleges that he was denied the effective assistance of counsel when his attorney failed to investigate defendant's mental condition and to use the evidence he would have discovered … as mitigation during defendant's sentencing hearing. To support these claims, defendant requested that the trial court appropriate funds to allow him to hire an expert. Defendant explained that his medical records and examinations by other experts reveal that he needs to be examined by a neuropsychiatrist.

> In support of his motion, defendant attached medical records that include a notation that defendant should be evaluated for temporal lobe epilepsy "as a possible cause of rage attacks." Defendant also attached affidavits from Harry Gunn, a clinical psychologist, and Jonathan Hess, a clinical neuropsychologist.

Gunn's affidavit states that "neuropsychological testing is highly recommended." Hess's affidavit states that, since childhood, defendant has suffered from a seizure disorder and that defendant has never been diagnosed or treated by a behavioral neurologist or neuropsychiatrist who is "educated in the psychiatric consequences of seizure disorders." Defendant's history reveals that violent behavior often follows one of his seizures. Based upon his examination of defendant, Hess believes that defendant suffers from "epipsodic discontrol," or rage attacks. A person suffering from a rage attack "would be unable to control his behavior or to conform his behavior to the requirements of the law." Finally, Hess states that, to properly diagnose defendant, "either a behavioral neurologist (who is also an epileptologist) or a neuropsychiatrist" will have to conduct a 24–hour ambulatory EEG.

Defendant therefore requested funding for an ambulatory EEG. Defendant's attorney averred that he had contacted Dr. Lyle Rossiter, Jr., who had agreed to perform an ambulatory EEG and to examine and evaluate defendant. The cost for the test, test interpretation, and evaluation of defendant totaled $3,786. The trial court denied defendant's motion to retain Dr. Rossiter. On appeal, defendant contends that the trial court abused its discretion in denying this motion.

Trial courts are permitted to exercise a great deal of discretion in resolving post-conviction petitions. This is done to ensure that defendant are permitted an opportunity to advance claims of constitutional deprivation. Whether to allow a defendant's motion for the appointment of an expert in a post-conviction proceeding is a matter that lies within the trial court's discretion. The key question to consider is whether the testimony would assist the court in deciding the question before it.

To decide that question here, we must consider the claims under which defendant's request for an expert arises. Defendant alleges that the expert is needed to allow him to demonstrate that his attorney was ineffective for failing to investigate defendant's mental condition. In particular, defendant contends that, had trial counsel properly investigated defendant's mental health, counsel could have ... demonstrated during the sentencing hearing that a statutory mitigating factor was present.

To succeed in his claims that he was denied the effective assistance of counsel, defendant must allege facts to demonstrate that his attorney's representation fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Because a defendant must satisfy both prongs of the test, the failure to satisfy either prong precludes a finding of ineffective assistance of counsel under *Strickland.* ...

Defendant also argues that his attorney was ineffective for failing to investigate and introduce evidence of defendant's extreme mental or emotional disturbance. To support this claim, defendant again relies upon the mitigation report. The person who prepared this report stated, in conclusion, that "it is possible, given Glenn's history of mental problems, he could be suffering from extreme mental or emotional disturbance." In his post-conviction petition, defendant asserts that his attorney was ineffective because "trial counsel presented no evi-

dence that Glenn Wilson was under extreme mental or emotional disturbance at the time of the murders." See 720 ILCS 5/9–1(c)(2) (West 1998) (noting that a mitigating factor is that "the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance, although not such as to constitute a defense to prosecution.") Defendant asserts that, had evidence of this extreme mental or emotional disturbance been discovered and presented to the trial court, a reasonable probability exists that he would not have been sentenced to death.

We note that defendant limits his argument to the statutorily identified mitigating factor relating to an extreme mental or emotional disturbance. This factor requires defendant to prove not only that he suffers from an extreme mental or emotional disturbance, but also that he *was under the influence* of that disturbance *when he committed the murders*. (Internal citations omitted.) Significantly, defendant could have argued, but chose not to argue, the presence of a nonstatutory mitigating factor: specifically, defendant could have argued that he suffers from an extreme mental or emotional disturbance, without arguing that he was under the influence of that disturbance when he committed the murders. Because defendant chose to invoke only the statutory mitigating factor, an essential element of defendant's claim is that he was under the influence of his alleged extreme mental or emotional disturbance when he murdered three persons in the liquor store.

Here, even if defendant has the frontal lobe damage that he alleges Dr. Rossiter could diagnose, no evidence exists that would support a conclusion that, when defendant committed the murders, he was under the influence of a mental or emotional disorder. Nothing in the rec-ord supports a conclusion that the robbery of the liquor store was anything other than a calculated plan to rob the store. Admittedly, defendant told the police that the shootings were "a spur of the moment thing" and "not supposed to happen." These statements, however, indicate only that, although the robbery was planned, the murders were not. These statements do not indicate that when defendant shot the people he was under the influence of a "rage attack." Stated simply, defendant alleges that his alleged disorder causes him to suffer uncontrollable "rage attacks." Here, no facts exist or are alleged to exist that would support a finding that the murders were committed by an individual under the influence of a rage attack. Defendant has not demonstrated that, even if he suffers from an extreme mental or emotional disturbance, he was under the influence of this disturbance when he committed the murders. Because defendant has not demonstrated that the alleged mental disturbance meets the criteria of the mitigating factor upon which he relies, we must conclude that the trial court did not abuse its discretion in denying defendant's motion to appropriate funds for an examination by Dr. Rossiter.

*People v. Wilson*, 191 Ill.2d 363, 247 Ill. Dec. 443, 732 N.E.2d 498, 501–04 (Ill.2000) (hereinafter *Wilson II* ) (some internal citations omitted.)

██ Because his claim was addressed on the merits in the Illinois Supreme Court, the Court's review is limited. Wilson can only obtain relief in this federal habeas corpus action if he can show that the state court adjudication resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States or

resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d). The Illinois Supreme Court clearly applied the correct law in analyzing the claim under *Strickland,* so it is only the unreasonable application of law and unreasonable determination of facts avenues that are potentially at issue here.

Wilson devotes a substantial portion of his Amended Petition to criticizing the performance of his trial counsel and the paucity of mitigation evidence presented at sentencing. He cites case law in his Memorandum emphasizing the importance of individualized sentencing, heightened reliability, and relevant mitigating evidence in capital cases. Wilson then shifts to a discussion of whether he has met the requirements to show that he is entitled to an evidentiary hearing: (1) has he made out a prima facie case of a constitutional violation? and (2) did he fail to develop the factual basis of his claim in state court?

Wilson argues that he has made a prima facie case of deficient performance by his trial counsel through a showing of the mental health evidence that was available to counsel but was not introduced in his argument for mitigation; he suggests that this is sufficient to satisfy the first prong of *Strickland.* This Court does not disagree. In fact, although not expressly stated in the Illinois Supreme Court's opinion, the state court implied deficient performance when it assumed that Wilson had "the frontal lobe damage that he alleges Dr. Rossiter could diagnose." *Wilson II,* 247 Ill.Dec. 443, 732 N.E.2d at 504.

■ However, deficient performance alone is only half of the prima facie case. The state court went on to find that Wilson had not demonstrated actual prejudice because there was no evidence "that would support a conclusion that, when defendant committed the murders, he was under the influence of a mental or emotional disorder" or that "he was under the influence of a 'rage attack'" when he shot the people in the S & S liquor store. Such a showing is necessary to establish the statutory mitigating factor under 720 ILCS 5/9–1(c)(2) that was argued by post-conviction counsel. Thus, in light of the complete failure to satisfy the second aspect of the statutory mitigating factor, the Illinois Supreme Court concluded that Wilson had failed to show a reasonable probability that but for counsel's error, the result of the proceeding would have been different.

Wilson does not make any real attempt to address this finding in his Memorandum. Rather, he proceeds as if the Court were conducting a de novo review of the ineffective assistance claim. Wilson argues: (1) as a result of his organic brain dysfunction, his "capacity for making choices—as opposed to reacting impulsively and instinctively—was crippled" (Petitioner's Memorandum at 29); (2) a proper investigation would have placed some of the other evidence in a different and more powerful light (i.e., a person with a normal brain might be able to transcend his circumstances, but his impairments sharply limited his ability to do so); (3) a proper investigation would have enabled counsel to avoid "the inept, and disastrous, mitigation presentation that he attempted", which "ultimately amounted to nothing more than a naked plea for mercy." Nor does Wilson address the Illinois Supreme Court's finding in his traverse, which is dedicated solely to the argument that he should be granted an evidentiary hearing to present the mental health evidence of his organic frontal lobe damage and its behavioral correlates, such as impulsivity, disinhibition, impaired judgment, etc.

Wilson summarizes the evidence that was developed by his lawyers in connection

with the state post-conviction proceeding and contends that the Illinois Supreme Court ignored such evidence in rendering its decision. However, the suggestion that this evidence was ignored is patently incorrect. To the contrary, medical records, mental health evaluations, and affidavits adduced by post-conviction counsel were part of the record. The court specifically noted this evidence, including the findings of Gunn and Hess, and presumed that Wilson in fact suffered from frontal lobe damage in considering his claims. *Wilson II*, 247 Ill.Dec. 443, 732 N.E.2d at 501–02. Where this evidence was considered but was found not to rise to the level necessary to constitute a showing of actual prejudice, the state court did not err in finding that an evidentiary hearing was unnecessary because Wilson could have, but did not, fully develop his claim by presenting opinion evidence from the two consulting mental health experts that as a result of his brain dysfunction, he was suffering from an episodic rage attack at the time of the instant offenses. Although the mental health experts opine that Wilson may suffer from episodic discontrol or periodic rage attacks, neither expressed any opinion that Wilson was actually under the influence of one of these periods of incapacity at the time of the murders despite ample opportunity to render such an opinion, and the record is simply devoid of evidence to this effect.

Rather than address this lack of evidence, Wilson goes off on other tangents. He contends that there was no evidence that he had any prior intent to commit homicidal acts when he set out for the S & S liquor store that night. However, while there may not be evidence of any specific intent to commit murder, the record clearly indicates a calculated intent to commit an armed robbery at a location where he was almost certainly going to encounter at least one store employee and quite possibly other customers as well. He also suggests that the fact that he did not shoot the store clerk cuts against the suggestion that the killings were a conscious effort to eliminate witnesses. Another inference that could just as easily be drawn from this fact is that Wilson possessed the ability to discriminate and make conscious choices during the course of the robbery and particularly at the time of the shootings. This ability to discriminate would be inconsistent with Hess' description of a rage attack as an episodic period of uncontrollable impulsivity or the suggestion in his Memorandum that Wilson effectively had no freedom of choice at the time of the killings but is consistent with the Illinois Supreme Court's conclusion that there was no evidence suggesting that Wilson was under the influence of a rage attack at the time of the killings.

Furthermore, the testimony of Wilson's son, Jarmaine, indicated that on the night of the murders, he was in the basement when he heard Wilson tell his mother while holding a gun that if she didn't drive the car to take him to the S & S, he would kill her. Wilson and his mother got into the front seat of the car, while Jarmaine got into the back; Wilson told Jarmaine to get down in the back seat. Alexander rode in a different car which accompanied the car in which Wilson was riding. Jarmaine and his mother waited in the car while Wilson and Alexander entered the liquor store. Several minutes later, Wilson returned to the car and ordered Jarmaine's mother to hurry. This again suggests that immediately prior to and following the murders, Wilson was capable of conscious and calculated planning rather than incapacitated by a seizure or period in which he was highly distractible and experiencing uncontrollable rage.

He argues that the state court "erroneously stated that a determination of 'fron-

tal lobe damage' would have required an evaluation by the neuropsychiatrist ... when in fact ... such a determination had already been made by the neuropsychologist." While he rightfully notes this technical error in the state court decision, the assertion is immaterial, as the Illinois Supreme Court went on to assume that he had the frontal lobe damage. Wilson also elaborates on the possible information that could be gleaned from a formal diagnosis of his purported seizure disorder as a precursor to his violent behavior. Yet despite the fact that his history reveals that his violent behavior often follows a seizure, the Court is unaware of any evidence indicating that Wilson suffered one of his seizures shortly before the killings; to the contrary, the record indicates that prior to the trip to the S & S liquor store, he had been hanging out with his brothers and free basing cocaine when they ran out of drugs and formulated the plan to rob the store to get more money to buy more cocaine. Finally, Wilson suggests that the shootings were an "instantaneous reaction" to his brother's pistol-whipping the store clerk, but Gault testified that Wilson had started the display of violence by firing off a warning shot to encourage her cooperation in opening the cash drawer prior to any act of violence by his brother.

None of these arguments in any way amount to the presentation of clear and convincing evidence rebutting the state court's factual findings or demonstrate an unreasonable error in the conclusion that Wilson had failed to show that he qualified for the statutory mitigating factor because he had not shown that he was actually under the influence of a rage attack at the time of the murders. Moreover, Wilson sought and received this Court's approval to hire a neuropsychologist and a neurologist specializing in seizure disorders for consultation in these proceedings, and even with the assistance of these mental health professionals, he has been unable to point to any evidence of record that would indicate an error in the Illinois Supreme Court's conclusion.

■ Wilson also suggests, without citation to any authority, that he was denied a full and fair opportunity to develop this issue in the state post-conviction proceedings. However, he consulted a clinical psychologist and a neuropsychologist, albeit without financial assistance from the court, and presented evidence from these sources in support of his post-conviction petition. The fact that he was not permitted to go beyond these mental health experts to a "neurologist (who is also an epileptologist) or a neuropsychiatrist" does not mean that he was not given a full and fair opportunity to develop his claim.

■ Although "access to the courthouse doors does not by itself assure a proper functioning of the advocacy process" and "fundamental fairness entitles indigent defendants to an 'opportunity to present their claims fairly within the adversary system,'" a fair opportunity does not entitle an indigent defendant to "all the assistance a wealthier counterpart might buy." *Ake v. Oklahoma,* 470 U.S. 68, 76–77, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), *quoting Ross v. Moffitt,* 417 U.S. 600, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974) (holding that "the fact that a particular service might be of benefit to an indigent defendant does not mean that the service is constitutionally required"); *United States v. Kennedy,* 64 F.3d 1465, 1473 (10th Cir.1995). Three factors are to be considered in determining what assistance is constitutionally required: (1) the effect on the defendant's interest in the accuracy of the trial without the requested assistance; (2) the burden on the government's interest if the assistance is provided; and (3) the probable value of the additional

assistance and the risk of error without the assistance. *Ake,* 470 U.S. at 78–79, 105 S.Ct. 1087.

■ Although the Illinois Supreme Court did not specifically discuss the *Ake* factors, its ultimate conclusion focuses on the third factor. After considering the additional mental health evidence offered in the post-conviction stage of the state court proceedings, the Illinois Supreme Court found that the additional evidence would not have affected the outcome of his trial or sentencing because the evidence would not have been sufficient to establish the statutory mitigating factor under 720 ILCS 5/9–1(c)(2) that was being argued by post-conviction counsel.[1] As the Court agrees that there is no reasonable probability that, but for counsel's substandard performance, the sentencing court would have concluded that the balance of aggravating and mitigating factors did not warrant the death penalty, Wilson is not entitled to the relief requested. *See Matheney v. Anderson,* 253 F.3d 1025, 1042 (7th Cir.2001), *citing Foster v. Schomig,* 223 F.3d 626, 636–37 (7th Cir.2000).

■ Assuming *arguendo* that this Court were to find that the state court's determination was incorrect, that would not entitle Wilson to relief, as it is well-settled that "it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly." *Bell v. Cone,* 535 U.S. 685, 122 S.Ct. 1843, 1852, 152 L.Ed.2d 914 (2002). Even assuming error, this Court does not find the Illinois Supreme Court's determination to be an unreasonable application of clearly established Federal law to the facts of this case or an unreasonable determination of the facts given the record evidence, and therefore will not grant relief on this issue under § 2254.

## II. Wilson's Second Claim is Without Merit

Wilson's second claim is that the trial court erred when it did not suppress all of his statements to law enforcement officers on *Miranda* grounds. His argument is set forth in its entirety as follows:

> In upholding the trial court's failure to suppress all of Wilson's statements on *Miranda* grounds, the Illinois Supreme Court committed the sort of federally cognizable error identified in *Williams.* That is, the Illinois Supreme Court (1) correctly determined that these issues were controlled by the rules articulated in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), but (2) the Illinois court fundamentally misapplied those rules to the facts of this case. *See Wilson,* 647 N.E.2d at 450–52. Among

---

1. In discussing this claim, the Illinois Supreme Court noted that counsel had not attempted to argue that this evidence would have qualified Wilson for the non-statutory mitigating factor of an extreme mental or emotional disturbance, which unlike the similar statutory factor of 720 ILCS 5/9–1(c)(2) does not require a separate showing that he was under the influence of that disturbance when he committed the murders. *Wilson II,* 247 Ill.Dec. 443, 732 N.E.2d at 504. However, no claim based on the non-statutory mitigating factor was ever presented to the state courts and therefore, even if Wilson's present petition could somehow be construed to include such a claim, it would be procedurally defaulted absent a showing of cause and prejudice or actual innocence. Wilson has made no attempt to make the requisite showing here, nor could cause for the default be presumed because there is no constitutional right to any assistance from counsel during the post-conviction process, let alone effective assistance. *Pitsonbarger v. Gramley,* 141 F.3d 728, 737 (7th Cir.1998), *citing Coleman v. Thompson,* 501 U.S. 722, 111 S.Ct. 2546, 2568, 115 L.Ed.2d 640 (1991); *Rodriguez v. Scillia,* 193 F.3d 913, 916 (7th Cir.1999).

other things, the Court incorrectly applied *Elstad* to a distinguishable set of circumstances, in which (1) Wilson's pre-*Miranda* interrogation took place under particularly coercive circumstances (a man of limited mental capacity, he had just tried to hang himself in jail and then had been told by the police that his cooperation might gain his release), and (2) his subsequent post-*Miranda* statements involved simply repeating his earlier pre-*Miranda* statements. *See Wilson,* 647 N.E.2d at 442–52. The effect of the Illinois Supreme Court's resolution of this issue can only be to create incentives for law-enforcement officers to (1) obtain incriminating statements without giving *Miranda* warnings and in particularly coercive circumstances, and (2) once having obtained such statements, "launder" them by having the individual repeat them after being provided the warnings. Such an approach represents a perversion, not a reasonable application, of *Miranda* and *Elstad.*

This claim was raised on direct appeal. Accordingly, to be entitled to relief in this habeas corpus action, he must demonstrate that the Illinois Supreme Court's resolution of the issue was either contrary to or an unreasonable application of clearly established Federal law as set forth by the Supreme Court of the United States, or that the Illinois Supreme Court made an unreasonable determination of the facts in light of the evidence presented. Wilson's argument is premised solely on the unreasonable application prong.

In addressing this issue, the Illinois Supreme Court found:

A trial court's decision to deny a motion to suppress will not be overturned unless the decision is manifestly erroneous. It appears from the suppression rulings that the trial court determined that *Miranda* warnings were necessary beginning at the time defendant was returned to the police station from the crime scene on the morning of June 2. The decision is not manifestly erroneous.

When an individual is taken into custody and interrogated, certain procedural safeguards are necessary to protect that individual's constitutional right against self-incrimination. (*Miranda v. Arizona* (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.) Not all statements given by a defendant after he "has been taken into custody are to be considered the product of interrogation." (*Rhode Island v. Innis* (1980), 446 U.S. 291, 299, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297, 307.) Any statement which is volunteered is not necessarily barred by the fifth amendment and can be admitted at trial.

The *Miranda* Court noted that "[t]he fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated." (*Miranda,* 384 U.S. at 478, 86 S.Ct. at 1630, 16 L.Ed.2d at 726.) Interrogation occurs through express police questioning or "any words or actions on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response from the *suspect." Innis,* 446 U.S. at 301, 100 S.Ct. at 1689–90, 64 L.Ed.2d at 308.

Although defendant was not given *Miranda* warnings until 10:10 a.m. on June 2, the statements he made about S & S prior to this time were voluntary and properly admitted at trial. At the hospital, Officer Sanders asked defendant if he knew anything about the S & S crimes. Defendant responded that "everyone knew who did it." Although defendant made these statements, he was

not a suspect in the S & S crimes at this time.

Upon defendant's return to the police station, defendant was the one who initiated the conversation about S & S. Defendant voluntarily told Katz and Bernardini about his knowledge of the S & S murders in hope of being released from jail. Defendant was not made any promises in return for his statements. At this time, defendant was not regarded as a suspect in the murders. Although the detectives expressed doubts about defendant's story, their doubts were not designed to elicit an incriminating response from defendant. As far as the detectives knew, defendant had no incriminating responses to make. In actuality, in the seven months between the murders and defendant's arrest, the police had not come across defendant's name as that of a potential suspect.

Defendant then voluntarily accompanied the detectives to the crime scene. The record does not indicate that defendant was forced to go with the police officers; nor does it reflect that the officers used threats, weapons, or any other show of force to coerce defendant to accompany them. (See *United States v. Mendenhall* (1980), 446 U.S. 544, 557–58, 100 S.Ct. 1870, 1879, 64 L.Ed.2d 497, 511–12.) None of the officer's statements at the crime scene were designed to elicit an incriminating response from defendant, as defendant was still considered a witness to and not a suspect in the murders. Only after defendant stated that he was supposed to receive $500 for being a lookout was he entitled to *Miranda* warnings. Only at this point in

time should the officers have known that any further questioning or words would be likely to elicit an incriminating response from a suspect. Thus, the trial court's allowing into evidence defendant's June 1 statements at the hospital and police station and defendant's June 2 statements at the crime scene was not manifestly erroneous, since defendant was not a suspect at these times.[2]

Defendant also contends that his second written statement on June 2 and his statement to Humber on June 4 were tainted by the failure of the police to provide *Miranda* warnings prior to the first written statement. We disagree. Defendant was not forced or coerced into making the first written statement to the police. He had been back at the police station for several hours before the statement was taken, had been given the opportunity to rest, and had been given food to eat. The reading of *Miranda* warnings to defendant at approximately 10:10 on the morning of June 2 cured the condition that made the prior voluntary, but unwarned, written statement inadmissible. (See *Oregon v. Elstad* (1985), 470 U.S. 298, 311–12, 105 S.Ct. 1285, 1294–95, 84 L.Ed.2d 222, 233–34.) Once defendant was warned of his rights, he was free to exercise his own decision of whether to make the second written statement. (See *Elstad*, 470 U.S. at 308, 105 S.Ct. at 1293, 84 L.Ed.2d at 232.) Two hours had passed from the end of defendant's first written statement until the time he was read his *Miranda* warnings. The record does not reflect that defendant was subject to police interrogation, force, threats or

---

2. After returning from the crime scene that morning, Wilson was given breakfast and a typewritten statement was taken from him between 6:00 a.m. and 8:10 a.m. without administering any *Miranda* warnings. The trial court determined, and the Illinois Supreme Court affirmed, that from the time Wilson stated that he was supposed to receive $500 for being a lookout, he was entitled to *Miranda* warnings. Because his first written statement was made without *Miranda* warnings, it was suppressed.

harassment during this two-hour period; defendant was not continually questioned about the S & S crimes. Defendant voluntarily waived his rights before making the second written statement. Although the *Miranda* warnings did not allow for the first written statement to be admitted into evidence, they did adequately warn defendant of his rights. Once defendant voluntarily waived these rights, the second written statement became admissible. Likewise, the statement which defendant made to Humber two days later, which was also directly preceded by *Miranda* warnings, was admissible.

We decline to rule on the statements defendant made to Detective Katz on June 9. These statements were not admitted against defendant at trial and cannot be used as a basis to reverse his conviction. Thus, the trial court's decision to deny defendant's motion to suppress the statements he made to the police was not manifestly erroneous.

*Wilson,* 164 Ill.2d 436, 647 N.E.2d at 918–19.

 "A decision is an 'unreasonable application' of Court precedent if 'the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" *Morgan v. Krenke,* 232 F.3d 562, 565 (7th Cir.2000), *citing Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000). In order to demonstrate an unreasonable application of law under § 2254(d), a petitioner must show that "the state court's application of clearly established federal law was objectively unreasonable." *Id.,* at 1522. In other words, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established

federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.*

 Here, after applying the principles of *Miranda, Elstad, Mendenhall,* and *Innis,* the Illinois Supreme Court determined that the statements in question were admissible. Wilson has argued only that the Illinois Supreme Court's application of *Miranda* and *Elstad* was unreasonable because the factual circumstances of his case are distinguishable based on the "particularly coercive" circumstances of the interrogation and the fact that his post-*Miranda* statements simply involved repeating his earlier pre-*Miranda* statements. This Court disagrees. On the record before the state court, it was not unreasonable to conclude that Wilson made the statements voluntarily and without any coercion at a time when he was not a suspect in the S & S killings. Even assuming *arguendo* that the Court agreed that the facts of this case were distinguishable and that this distinction made the Illinois Supreme Court's application of *Miranda* and *Elstad* incorrect, this is not enough to show an unreasonable application. The Court cannot "second-guess a state court's adjudication of an issue simply because we disagree with it. The drastic act of upsetting a judgment entered by another judicial system, after full litigation of the question, is reserved for grave occasions." *Morgan,* 232 F.3d at 567.

 Wilson has not challenged the Illinois Supreme Court's factual finding that the officer's questions were not designed to elicit incriminating responses or that he voluntarily accompanied the officers to the crime scene under the standard articulated in *Mendenhall.* Moreover, he admits that the Illinois Supreme Court was correct in determining that the rules in *Miranda* and *Elstad* controlled the issue. Rather, he

appears to suggest that the fact that his post-*Miranda* statement involved repeating his pre-*Miranda* statement warranted a different outcome, his suggestion finds no support in either *Miranda* or *Elstad.*

The trial court concluded, and the Illinois Supreme Court affirmed, that once Wilson gave the story about being offered $500 to act as a lookout, his status shifted from that of potential witness to potential suspect and he was entitled to receive *Miranda* warnings. Accordingly, his first written statement that he made before he was advised of such warnings violated *Miranda,* and was suppressed. Wilson suggests that this *Miranda* violation effectively tainted his second written statement, rendering it inadmissible as well.

However, in *Elstad,* the Supreme Court rejected the suggestion that subsequent statements are "fruit of the poisonous tree" stemming from the initial non-coercive *Miranda* violation and found that an initial failure to administer *Miranda* warnings can be cured by the subsequent administration of those rights. *Elstad,* 105 S.Ct. at 1293; *United States v. Abdulla,* 294 F.3d 830, 835 (7th Cir.2002); *United States v. Muhammad,* 120 F.3d 688, 697 (7th Cir.1997). Specifically, the Supreme Court held that the "subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." *Elstad,* 105 S.Ct. at 1296. Under such circumstances, the "suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings," and the factfinder "may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights." *Id.* at 1295–96; *Muhammad,* 120 F.3d at 697.

The facts of this case are similar to *Elstad,* where the suspect made an initial incriminating statement before being advised of his *Miranda* rights and then after an hour had passed, was advised of and waived his *Miranda* rights before executing a written confession. 105 S.Ct. at 1285. Here, Wilson had voluntarily accompanied police officers to the crime scene, returned to the police station, and was given breakfast before giving his first written statement; there is simply no evidence indicating that this statement was anything other than voluntary. After two hours had passed and he had an opportunity to rest, he was read his *Miranda* warnings, waived his rights, and stated that he was willing to given another voluntary statement. Wilson then gave a second written statement that was essentially the same as his first written statement. There is nothing in the record evidencing actual coercion or the presence of circumstances calculated to undermine Wilson's ability to exercise his own free will or any other basis for finding that Wilson's waiver of his rights and execution of the second written statement were anything other than knowingly and voluntarily made. Accordingly, based on the surrounding circumstances and the entire course of police conduct, the holding in *Elstad* is controlling.

Wilson has offered nothing more than his subjective opinion that the possibility of distinguishing the facts of this case from those in *Elstad* compels a different result and has asked the Court to exercise its independent judgment in making this assessment because his proffered outcome would result in better policy. However, it is abundantly clear under Supreme Court precedent that subjective opinions have no place in this Court's review of a federal habeas corpus action based on a purported

unreasonable application of federal law and that the Court is not to exercise its independent judgment in reviewing the state court's determination. Given the factual findings contained in the opinion, which are not contested and presumed to be correct for purposes of this motion, the Illinois Supreme Court's application of *Miranda* and *Elstad* was imminently reasonable.

The Illinois Supreme Court also found: Other evidence adduced at trial included [Detective Dan] Katz' testifying that the location of the bodies inside the store was not released to the press, but defendant knew of the location of one of the bodies when he spoke to police at the crime scene. Two of defendant's cell mates testified that defendant told them that he robbed a liquor store and shot someone. John Daniels testified that in August of 1990, defendant told him that he and some other men went into a liquor store in Bloomington to commit a robbery and that people were shot and another lady was pistol-whipped. Robert Faraci testified that in January 1991, defendant told him that he robbed a liquor store and shot someone in Bloomington. Defendant's son, Jarmaine Wilson, also testified that on the night of the murder, defendant used a gun to threaten his mother to drive a car. Jarmaine's mother acquiesced and got into the car; defendant sat on the front passenger side and Jarmaine rode hunched down in the back. Alvin Alexander rode in a separate car which accompanied the car in which Jarmaine was riding. When the car stopped, defendant got out while Jarmaine remained hunched down in the backseat. Several minutes later defendant got back into the car and ordered Jarmaine's mother to hurry.

The State also offered the testimony of three other witnesses who had gone to S & S on the night of the murders to buy liquor. Two of these witnesses testified that they saw two black men walking toward S & S on October 27. Each witness stated that the police drawings based on Gault's descriptions were good likenesses of the men they say. The third witness made an in-court identification of defendant as the taller man she saw approaching S & S on the night of October 27.

*Wilson*, 207 Ill.Dec. 417, 647 N.E.2d at 917. Accordingly, in light of the other substantial evidence of Wilson's guilt, the admission of the statements at issue, even if erroneous, was harmless error because it would not have had a "substantial and injurious effect or influence on the verdict which resulted in actual prejudice to the defendant." *Jenkins v. Nelson*, 157 F.3d 485, 494 (7th Cir.1998), *citing California v. Roy*, 519 U.S. 2, 117 S.Ct. 337, 338, 136 L.Ed.2d 266 (1996). Wilson has therefore failed to meet his burden of demonstrating an objectively unreasonable application, and his second claim must fail.

### III. Wilson's Third Claim is Without Merit

Wilson's third claim is that his trial counsel was ineffective for failing to challenge the admissibility of these statements on the ground that they were involuntary and the result of coercion and failing to seek suppression of statements that he gave to a county mental health therapist. As set forth above, under *Strickland*, a petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness and that he was prejudiced by counsel's errors.

Petitioner cannot reasonably dispute that the Illinois Supreme Court applied the proper law to the facts of this case in the form of the well-established standard of *Strickland*. Accordingly, in order to warrant relief on these claims, it is not

enough to show that he would have satisfied the requirements of *Strickland* if his claim were being analyzed in the first instance, "because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly." *Bell*, 122 S.Ct. at 1852. Rather, Wilson "must show that the [state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Id.* In fact, as restated by the Seventh Circuit:

> When a state court applies established law, its decision must be respected unless "unreasonable." *Strickland* builds in an element of deference to counsel's choices in conducting the litigation; § 2254(d)(1) adds a layer of respect for a state court's application of the legal standard. As we put it in *Lindh*, "when the constitutional question is a matter of degree, rather than of concrete entitlements, a 'reasonable' decision by the state court must be honored." *Strickland* calls for inquiry into degrees; it is a balancing rather than a bright-line approach, just like the question about confrontation rights we addressed in *Lindh*. This means that only a clear error in applying *Strickland's* standard would support a writ of habeas corpus.

*Holman v. Gilmore*, 126 F.3d 876, 881–82 (7th Cir.1997).

### A. Statements to Law Enforcement Officers

The Illinois Supreme Court addressed this claim on direct appeal. The Supreme Court stated:

> Defendant also contends that he was denied effective assistance of counsel to the extent trial counsel failed to argue that defendant's statements to the police were involuntary because of coercive circumstances. To prevail on a claim of ineffective assistance of counsel, defendant must prove that defense counsel's actions were so deficient that they were unreasonable and that the actions prejudiced the result of the trial. (*Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693.) Defense counsel's actions here were not so deficient as to have resulted in ineffective assistance of counsel. The motions to suppress defendant's statements asserted, among other claims, that "the statement were not made by the defendant voluntarily." Defense counsel sufficiently raised this claim in the trial court.

*Wilson*, 207 Ill.Dec. 417, 647 N.E.2d at 919. Thus, the Illinois Supreme Court found Wilson's claim to be without merit because his trial counsel had in fact challenged the admissibility of his statements to law enforcement officers on the grounds of involuntariness and coercive circumstances where trial counsel argued that "the statements were not made by he defendant voluntarily" and the trial court was aware of the timing and nature of the circumstances under which Wilson made the statements in question. This issue was also before the trial court during the post-conviction proceedings, where Wilson's post-conviction counsel argued additional elements of coerciveness, including Wilson's mental condition and history of brain disorders.

Wilson has not shown any incorrect application of clearly established Federal law, much less anything that would rise to the level of an objectively unreasonable application, in the state court's analysis. In fact, the one paragraph devoted to applying the law to the facts for both his second and third claims addresses only the second claim and does not even attempt to articulate an ineffective assistance argument, let alone identify how the state court's determination that the issue had

been adequately presented by trial counsel was objectively unreasonable. He is therefore not entitled to relief on this aspect of his claim.

### B. Statements to Mental Health Therapist

 This claim was also addressed by the Illinois Supreme Court on direct appeal. Specifically, that court stated:

Defendant claims that he was also denied effective assistance of counsel when defense counsel failed to seek suppression of the statements he made to Julie Rice. Defendant claims that Rice is an agent of the State and that Rice knew when she was speaking with defendant that some of her questions could have elicited incriminating responses. Since he was in custody at the time of Rice's visit, defendant claims he should have been given *Miranda* warnings. Defendant argues that defense counsel erred when he failed to recognize that the statements were obtained in violation of defendant's constitutional rights and when he failed to move to suppress the statements on this ground. Defendant also claims that he was prejudiced by defense counsel's failure to have the statements suppressed.

As mentioned, to prevail on a claim of ineffective assistance of counsel, defendant must prove that defense counsel's actions were so deficient that they were unreasonable and that the actions prejudiced the result of the trial. (*Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693.) In support of his position, defendant relies on the case of *Estelle v. Smith* .... Defendant's reliance on *Smith* is faulty. Unlike the defendant in *Smith,* the defendant here had not been charged with the murders and armed robbery before Rice went to visit him. Rice's visit was not court ordered. The purpose of Rice's visit was to assess whether defendant was still suicidal, and not to interrogate defendant about S & S. Thus, defendant did not have the right to be read *Miranda* warnings before Rice spoke with him.

As a general rule, trial counsel's failure to file a motion does not establish incompetent representation, especially when that motion would be futile. Whether or not to file a motion is a matter of trial strategy which will be accorded great deference. Defense counsel's failure to file a motion to suppress defendant's statements to Julie Rice did not result in ineffective assistance of counsel.

In addition, defendant has failed to prove that the use of the statements prejudiced the outcome of his trial. The statements which defendant made to Rice did not constitute all of the State's evidence against defendant. The State provided other witnesses who testified that defendant told them that he had committed an armed robbery and shot someone; defendant's own statements about his involvement were also admitted. We cannot say that the result of the trial would have been different had the statements been suppressed.

*Wilson,* 647 N.E.2d at 919–20.

Again, Wilson has devoted one paragraph of his 38 page brief to applying the law to the facts for both his second and third claims, and in this paragraph, has addressed only the second claim without attempting to articulate an ineffective assistance argument. This virtually non-existent effort falls short of demonstrating an unreasonable application of clearly established Federal law.

### IV. Wilson's Fourth Claim is Without Merit

 Finally, in what can best be described as a throw-away argument that

occupies less than one full page in a 38 page brief, Wilson argues that the Illinois death penalty system has pervasive constitutional flaws in that it contravenes the Eighth and Fourteenth Amendments in several ways. He states that it effectively places a burden of proof on the defendant, thereby precluding meaningful consideration of mitigation, and does not sufficiently minimize the risk of arbitrarily and capriciously imposed death sentences. Wilson then summarily concludes that this runs afoul of the Supreme Court's teachings in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) and *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

Such cursory treatment is not sufficient to preserve the issue for review, and the Court therefore deems this argument waived. *See United States v. Eddy,* 8 F.3d 577, 583 (7th Cir.1993); *United States v. Berkowitz,* 927 F.2d 1376, 1384 (7th Cir. 1991) (finding that "[w]e have repeatedly made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues).")

Moreover, this claim was raised on direct appeal to the Illinois Supreme Court. In rejecting Wilson's claim, the court noted that "these arguments have been addressed and rejected by this court on several occasions." *People v. Wilson,* 164 Ill.2d 436, 207 Ill.Dec. 417, 647 N.E.2d 910, 923 (1994), *citing People v. Henderson,* 142 Ill.2d 258, 154 Ill.Dec. 785, 568 N.E.2d 1234 (Ill.1990). Similar arguments have also been consistently rejected by the Seventh Circuit. *See Williams v. Chrans,* 945 F.2d 926, 936 (7th Cir.1991); *Silagy v. Peters,* 905 F.2d 986, 998 (7th Cir.1990). Wilson's bald citation to *Furman* and *Lockett* in no way constitutes a showing that the state court's findings were either

contrary to, or an unreasonable application of, federal law as determined by the Supreme Court of the United States or that the state decision was based on an unreasonable determination of facts given the evidence of record. Accordingly, he is not entitled to relief on this claim.

## CONCLUSION

For the reasons set forth above, Petitioner's Amended Petition [# 21] is DENIED. This matter is now terminated.